Argued September 9, reversed September 24, petition for rehearing denied October 22, 1952

SHEPARD ET UX. *v.* PURVINE ET AL.

248 P. 2d 352

*W. C. Winslow,* of Salem, argued the cause for appellants. With him on the brief was Norman K. Winslow, of Salem.

*George A. Rhoten,* of Salem, argued the cause for respondents. On the brief were Rhoten, Rhoten & Speerstra, of Salem.

Before ROSSMAN, Acting Chief Justice, and LUSK, LATOURETTE, WARNER and TOOZE, Justices.

## TOOZE, J.

This is a suit for a declaratory judgment, brought by Ralph C. Shepard and Lela A. Shepard, his wife, as plaintiffs, against B. J. Purvine and Lenore Purvine, his wife, W. R. Purvine and Paula Purvine, his wife, and Margaret Purvine, as defendants, wherein plaintiffs seek to establish a right of way for a pipe line to pipe water from a spring on defendants' lands to the property of plaintiffs and to establish a water right to a portion of the water rising in said spring. Plaintiffs also seek injunctive relief. A decree was entered in favor of defendants and dismissing plaintiffs' complaint; plaintiffs appeal.

Defendants B. J. Purvine, W. R. Purvine, and Margaret Purvine are the sons and daughter, respectively, and sole heirs at law of one C. M. Purvine, now deceased. The mother of said defendants died in 1945, and C. M. Purvine died March 30, 1946.

For more than fifty years continuously immediately prior to his death, C. M. Purvine was the owner of the northeast one-quarter of the southwest one-quarter of section 24, township 6 south of range 4 west of the

Willamette meridian, in Polk county, Oregon, and defendants B. J. Purvine, W. R. Purvine, and Margaret Purvine are the successors in interest of said C. M. Purvine in and to said real property by right of inheritance.

Since 1910, plaintiffs have been and now are the owners of 160 acres of land in Polk county, and said lands adjoin those of defendants on the north for a distance of one-half mile. Plaintiffs engaged in the dairy and poultry business. Prior to 1944, there were constructed on their premises and in use their own dwelling house, an additional dwelling for employes, a barn, and a poultry house. Following 1944, an additional dwelling house for the use of employes was constructed by plaintiffs.

At all the times involved in this litigation, there were and now are located upon the Purvine land several springs from which flows an adequate supply of pure water to supply all the uses and demands of the owners of the Purvine property, as well as the uses and demands of plaintiffs for domestic and livestock purposes.

The properties of both plaintiffs and defendants lie in that portion of eastern Polk county known as Spring valley. As a general rule, well water in that section is unsatisfactory for domestic use. It is hard water, contains much sediment, has an offensive odor, and is unpalatable. When heated, a yellow scum forms on top, and clothes washed in it have a tendency to turn yellow. Rust quickly forms in the plumbing.

Plaintiffs moved upon their premises in 1913, and, until 1944, the only water they had on their lands for domestic use came from wells dug thereon. For more than thirty years, in order to have water suitable for washing and other household purposes, plaintiffs were

obliged to and did haul pure water from places off their premises. One such place was a stream that flowed from the springs on defendants' property.

Plaintiffs contend that in February, 1944, they entered into an oral agreement with C. M. Purvine, now deceased, whereby it was agreed that plaintiffs might have the use of one of the springs located upon the Purvine land for domestic purposes if they would apply to the state engineer and obtain a permit to use the water and then improve said spring and pipe the water therefrom to plaintiffs' premises at their own expense, and that plaintiffs might have, in addition to said water and the use thereof, a right of way across the Purvine premises to locate said pipe line. As a necessary incident of said rights so granted, plaintiffs claim the further right to go upon said premises to repair the system whenever necessary. Plaintiffs assert that the rights given them were intended to be, and were, permanent.

Defendants admit that plaintiffs were given oral permission by C. M. Purvine to use water from the spring in question and to construct the means of conveying that water from the spring across the lands of defendants to the property of plaintiffs, but they insist that the rights so granted were intended to be, and were, temporary in character and, therefore, subject to revocation.

This conflict between the parties respecting the terms of the original agreement between plaintiffs and C. M. Purvine presents the only issue in this case. If the agreement was as is contended for by plaintiffs, then plaintiffs have an irrevocable license to use the water and maintain their pipe line across defendants' lands. *Baum et ux v. Denn et al,* 187 Or 401, 407, 211 P2d 478; *Willson v. Watts,* 156 Or 134, 138, 66 P2d

1172; *Heisley et al. v. Eastman et al.,* 102 Or 137, 151 201 P 872; *Hallock v. Suitor,* 37 Or 9, 13, 60 P 384; *Ewing v. Rhea,* 37 Or 583, 586, 62 P 790, 82 Am St Rep 783, 52 LRA 140. There is no dispute between the parties but that plaintiffs expended substantial sums of money in purchasing and laying the pipe necessary to convey this spring water to their premises and in installing a water system in the buildings on their premises to be served.

In *Baum et ux v. Denn et al,* supra, at page 407, this court, speaking through the late Justice Belt, said:

"Having found that there was a parol license for plaintiffs to use the road, it remains to be seen whether such license has become irrevocable by reason of the plaintiffs having made permanent and valuable improvements in reliance thereon. In most jurisdictions a parol license to use land may be revoked by the licensor, as it creates no interest in the land and is not governed by the Statute of Frauds; *but in this state*—in keeping with the minority rule—*such license becomes irrevocable if, in reliance thereon, the licensee makes permanent and valuable improvements.*" (Italics ours.)

If the original agreement was as contended by defendants, then, of course, plaintiffs acquired no permanent rights in and to the waters of the spring, nor to a right of way across defendants' lands for their pipe line, and the license they originally had was revocable and has been revoked by defendants.

In solving the problem before us, it is necessary that we consider the facts and circumstances of this case, basing our ultimate conclusions thereon, rather than upon any legal propositions.

■ The record discloses a direct dispute between the parties as to the terms of the original agreement. The

trial court decided this dispute in favor of defendants. Ordinarily, in an equity proceeding, which is tried de novo in this court, we give great weight to the findings of the trial judge upon disputed questions of fact. We do this as a matter of expediency. However, as we have often stated, this court is not bound by such findings, and, in every equity case, it is incumbent upon us to make our own independent investigation and study of the record; and if, after such independent study, we arrive at conclusions different from those reached by the trial court, it is our duty so to declare.

In passing, we note that, in its memorandum opinion accompanying the decision, the trial court emphasized the failure of plaintiffs to obtain written evidence establishing their claimed rights to the water and right of way for the pipe line. The court said:

"* * * Counsel for plaintiffs urge that the account given by plaintiffs is the way the transaction naturally would have occurred between neighbors. This reasoning, however, overlooks the consistent and almost lifetime attitude of C. M. Purvine to the use of his water by plaintiffs. It also overlooks the fact, that plaintiffs were aware of the fact that such rights are normally granted by deed and he desired a deed therefor. It appears to this Court, that if plaintiffs had been acting with ordinary care in looking after their interests, they would have recognized the importance of such a deed, and would have asked for it and offered to pay the value of the water and the right of way in order to insure its permanancy. * * *

"* * * * * *

"* * * *The best that can be said for plaintiffs, is that if the facts are true as recited by them, they were so negligent in protecting their newly acquired rights by proper evidence thereof that this Court is very hesitant in recognizing them.*" (Italics ours.)

As indicated in its opinion, the trial court labored under a mistaken idea as to plaintiffs' claim and the evidence in connection therewith. The court said: "It is claimed by plaintiffs, that this permanent permissive right was offered to them voluntary and not at plaintiffs' request." Plaintiffs made no such claim, nor is there any evidence in the record to that effect. The evidence is conclusive that whatever rights were given them by C. M. Purvine were given at plaintiffs' request. In other words, plaintiffs were the moving parties.

We think the trial court erred in concluding that, if the facts as to the original agreement were as related by plaintiffs, they were negligent in not protecting their rights by acquiring deeds therefor, and, because of such negligence, were not entitled to have their rights recognized. This position assumed by the trial court permeates its entire opinion and unquestionably had much to do with the court's ultimate conclusions upon the facts.

The evidence shows that, in 1903, C. M. Purvine and his family left the Purvine farm and moved to Portland. Purvine worked on the Willamette river as a chief engineer for the Star Sand Co. In approximately 1924, Mrs. C. M. Purvine moved back to the farm and remained there until the spring of 1944. Purvine spent his weekends at the farm and managed its affairs. He returned to live on the farm about the year of 1939 and continued to live there until 1944, when he and his wife returned to Portland.

For more than 60 years the Purvines made use of water rising from the springs on their premises, for domestic purposes, for irrigation, and, for a few years, for power purposes. For their domestic use, as well as for irrigation, they utilized waters from

what is known as the upper spring. They had that water piped into their home and outbuildings. The overflow from this spring, together with the flow from other springs near-by, formed a stream that flowed across and off their lands. Irrigation was accomplished largely by the use of ditches dug to convey the water. About 1950, a sprinkler system was installed for use on approximately ten acres of land. A dam was constructed in the stream below the upper spring, thus impounding a portion of the waters, to be used during the summer months. For many years there existed another dam a short distance below the spring involved in this litigation; but long ago this dam ceased to be of any use, and it was not until about 1949 that it was reconstructed.

Over a period of many years, C. M. Purvine filed several applications with the state engineer for permits to use the waters of these springs for domestic, irrigation, and power purposes, and permits were issued. However, the evidence shows that at no time did the Purvines ever make use of all the waters from said springs; and with the exception of a short period of time during the dry season of one year, water ran continuously the year around in the stream formed by said springs.

Plaintiff Ralph C. Shepard went to Portland in 1913 for the purpose of discussing with C. M. Purvine the possibility of securing the use of one of the Purvine springs. Plaintiffs offered Purvine the sum of $100 for a deed to one of the springs and a right of way for a pipe line. Purvine agreed to sell. Before the deal was consummated, Purvine wrote plaintiffs stating that he had changed his mind, refusing to sell the rights in question.

After C. M. Purvine moved back to the farm, plain-

tiffs and the Purvines became very friendly and neighborly. They exchanged many courtesies and accommodations. Even before Mr. Purvine returned to live on the farm, plaintiffs and Mrs. Purvine were friendly, and plaintiffs performed numerous neighborly services for her.

In February, 1944, according to plaintiffs, or in the late fall of 1942, according to defendants, plaintiffs again requested permission from C. M. Purvine to use a portion of the water from what is now called the Shepard spring (located a short distance below the upper spring) and the right to convey the water across the Purvine lands to their own property, for their domestic purposes. Plaintiff Ralph C. Shepard gives one version of this transaction between himself and C. M. Purvine; whereas the defendant Paula Purvine, who claims to have been present at the time, gives another. A decision in this case depends entirely upon which version is to be accepted.

Plaintiff Ralph C. Shepard testified that, in early spring of 1944, he went to the Purvine farm and interviewed Mr. Purvine. According to Shepard, only he and Purvine were present at the conversation. He testified as follows:

"A Well, I went right over and I interviewed Mr. Purvine.

"Q Where did you interview him?
"A He was down at his barn.

"Q Will you tell us what was said, because this is important?
"A I said, Mr. Purvine, I have watched thousands of barrels of water a day go right past my place, lovely water, and we have none, and I just covet enough of that water so's we would have a satisfactory water supply. Now, that's the start of the conversation.

"Q  Go ahead with it. Tell the whole story.

"A  Well, he said, Come over this afternoon. I went over right after dinner, and he had made a little cross, that is, a stick with a cross on it, and he had his level, and he said, Come with me, and we went up and there was this spring on the south side of the creek that was in the shape of a bowl and the water bubbles up, it don't flow into it, it comes up from below the surface, and he says right there—

"Q  I did not get that—what did he say?

"A  He said, First we will see whether you have sufficient fall, and he set up his tripod or stick and put a level on it, and we levelled across at my house, and this cross was levelled off and showed it went some little distance above the top of the highest chimney on my house, so it would indicate that it was downhill to my house, and he said, There, that's your spring, tie into it.

"Q  I want all the discussion, too, that you had about it?

"A  Well, I said, That, Mr. Purvine, is the best news I've heard in a long time. Now, I says, what arrangements are we going to have about this spring, what do you want for this accommodation? He says, Not a cent, that's public water, and, he says, You go right up to the State Engineer's office and file on it.

"Q  I want to interrupt you here, and come back to it. The spring he pointed out to you at that time was the spring from which you are now taking your water?

"A  Yes, sir.

"Q  Was it being used then for any purpose whatever?

"A  No, sir.

"Q  Had there ever been any improvement made on it?

"A  Not to that spring, as far as I know.

"  *  *  *  *  *

"Q  Well now, coming back to this conversation with Mr. Purvine when he showed you this spring,— you pick up this conversation where I interrupted you, Mr. Shepard—?

"A  Well, I said, Would it be all right for me to start installing a pipeline right away? and he said, It certainly will, go right to work.

"Q  Well now, right there on that matter, was there any designation as to where that pipeline would go?

"A  Well, we just naturally kind of—it was a natural indication—

"Q  I don't care about the natural—What did you say to him?

"A  I said, We will start down the canyon—it was quite an incline—and gradually go around— there was one particularly definite object—it is a large laurel or madrona tree—it is in the shape of a 'V'—and we said We will just go right around and by the time we get below that we will take a direct route to my buildings.

"Q  Is that the route you followed?

"A  Yes.

"Q  Now, as a result of that conversation, what did you do about filing your application for the water in that spring?

"A  I think that has been brought up in this previous testimony. I filed on it. I went right up to the State Engineer's office and filed an application for what is indicated in this—

"Q  In the permit that has already been offered and your application has been received. Now, what did you do, in addition to that, with reference to going to work and installing your water system?

"A  Well, I employed a couple of guys and we went to digging ditch, and I bought pipe and we went to work and dug our ditch and hooked our pipe together.

"Q What did you have to do to the spring in order to make an intake?

"A Very little. This is in the shape of a bowl, and I never dug it very deep, it is rocky in the bottom anyway, and I just merely damned it up a little to raise the level, not very many inches, and we put our pipe in the bottom of this and put a screen over it.

"Q What is the land used for on the Purvine property that you cross with your pipeline?

"A Just pasture land, grassy land.

"Q If it is ever determined to use it for any other purpose, is your pipeline deep enough that it would not interfere?

"A Yes, they would never find it with ordinary tillage, as far as I know, except for a few feet where it starts down this creek bed, it is rocky and rough, and we did not attempt to put it more than eight or ten inches under the ground, and of course, for a little way this spring sits up and there is kind of a sag, and for a joint or two of pipe it is entirely exposed.

"Q Then how deep does it go?

"A It gradually goes in from nothing to never less than twenty inches.

"Q How far from the spring to where it is twenty inches deep?

"A From the spring?

"Q Yes—?

"A I estimate probably fifty feet."

The evidence shows that, on February 9, 1944, plaintiffs filed in the office of the state engineer an application for a water right on the spring in question, applying for the use of 0.015 cubic feet per second of such water for domestic and livestock purposes. The evidence also discloses that plaintiffs immediately commenced the construction of their pipe line and constructed it at a cost in excess of $700. Two thousand

two hundred feet of pipe was laid, and it was placed a sufficient distance beneath the surface of the ground so as to cause no interference with ordinary farming operations. This water was piped into the dwelling houses and other buildings on plaintiff's premises. Later it was piped into the new dwelling constructed as above mentioned. Since the installation of the system, plaintiffs have made continuous use of the waters from the spring, but never more than the amount applied for. The water used by plaintiffs is approximately 10 per cent of the flow from the spring, the remaining 90 per cent of the water running into the stream above mentioned. The water so used by plaintiffs is equivalent to approximately 2 per cent of all the water rising from said springs on defendants' premises.

In constructing their pipe line, plaintiffs had to cross a portion of land owned by one Barker. Barker gave them permission to cross, stipulating only that the pipe be laid deeply enough in the ground so as not to interfere with ploughing operations. No payment was requested nor made for this privilege. The line also had to cross land owned by one Mrs. Hiatt, but now owned by one Terrill. Mrs. Hiatt also gave plaintiffs this right without any payment being made therefor. No deeds were requested, nor were any executed, in connection with the rights of way across the Barker and Hiatt lands. As an accommodation to Mrs. Hiatt, and upon their own motion, plaintiffs installed one hydrant connected with the pipe line on her land, so that her livestock might be furnished water.

We now present the version of the agreement between plaintiffs and C. M. Purvine as given by Paula Purvine, a witness for defendants, who claims it oc-

curred in the fall of 1942 instead of early spring, 1944. She testified:

"Q Now, while you were there in 1942, did you hear some conversations with Mr. Ralph Shepard concerning the use of a spring?

"A Yes. We were in the livingroom, Mother and I—

"Q Well, just a minute before we get to the conversation itself, let us identify, if we can, as closely as possible when that occurred?

"A Well, I don't remember the day or the month, really, but I know it was late fall, and that Mr. Shepard had on a coat or a heavy jacket, and Dad was bundled up, and we had a fire in the fireplace, but I just cannot remember the exact time, but it was late fall.

"Q In 1942?
"A In 1942.

"Q Now, are you sure about the year?
"A Yes, I am.

"\* \* \* \* \* \*

"Q All right. Now, did you hear more than one conversation at the Purvine home about this, or did it all occur in this conversation?

"A Mr. Shepard was there one time alone, he came in with Dad, he had gone down to the barn.

"Q He was there one time alone?

"A Yes; and another time they came in, Mr. and Mrs. Shepard together.

"Q I see. How far apart were these times?

"A Possibly three or four days.

"Q All right, Now, I want you to relate to the judge the substance of the conversation that took place on those occasions at the Purvine home, relating to the use of the spring?

"A Well, Dad and Mr. Shepard came in. As I say, Dad had been at the barn, and they came in through the back door and into the livingroom, and

Mr. Shepard asked about the water, and Dad told Mother, Well, he says, Mr. Shepard wants some of the spring water, and that his pump had gone bad and he was going to have to dig a new well but he could not get casing pipe at that time; and Dad was very upset about it because he did not want to let him have the water and he would give him no definite answer at that time and told him to come back in a few days and he would tell him whether he could make it possible or not; and in a few days in came Mr. and Mrs. Shepard, and Dad asked Mr. Shepard if he would give his word that he would not cause any trouble in any way or file on the water *if he let him use the water temporarily,* and Mr. Shepard said, Charley, you know I am a man of my word, I will promise you there will be no trouble. (Italics ours.)

"Q  What was said, if anything, about what was meant by 'temporarily'?

"A  Until he could get the casing pipe or have a new well drilled, and they were very happy when Dad finally told him after Ralph promised to cause no trouble, why, both Mr. and Mrs. Shepard was very glad that Dad consented to let them have the water for the time being.

"*  *  *  *  *  *

"MR. RHOTEN: Is there anything else of the substance of that conversation which you can remember?

"A  No, I don't remember any other than Mrs. Shepard complaining about the water, and Mr. Shepard promising that there would be no trouble over the water if he let him take it *temporarily.* (Italics ours.)

"Q  Do you recall any of the details about what he said about filing on it?

"A  Yes, he said he promised not to file or cause any trouble in any way, and he says, You know, Charley, you know I am a man of my word."

The testimony of plaintiff Ralph C. Shepard and Paula Purvine cannot be reconciled. One of them is not telling the truth, although we do not mean to suggest that either has been deliberately false in his or her testimony. One may have been honestly mistaken. It must be kept in mind that Shepard was relating a conversation that he claims occurred seven years prior to the trial. The witness Paula Purvine was relating a conversation which she asserted took place approximately nine years before trial. Recognizing the frailties of the human mind, it is not difficult to understand how one's memory as to events occurring some seven to nine years prior and, particularly, as to words used in a conversation, might be rather dim and inaccurate. The only substantial difference between the version given by Shepard and that given by Paula Purvine is the use and repeated use by Paula of the word "temporarily". In some portions of his testimony, Shepard is corroborated by his wife. For example, upon the question of whether or not C. M. Purvine had knowledge of the pipe-line construction by plaintiffs and their use of the water, Mrs. Shepard testified:

"Q  Did you ever have a conversation with Mr. C. M. Purvine regarding it yourself after the works were entirely installed?

"A  Yes, I did. Now, I don't remember—Mr. Purvine—I don't remember exactly the state of his health after he went to Portland,—but he came over one day and he said, Mrs. Shepard, how do you like the water?—and I said, It is just heavenly after using that yellow water and I am so glad we have it; and he said, It's a shame you did not have it years ago."

The only corroboration of the "temporary permit" version of the agreement, as related by Paula Purvine,

are certain self-serving declarations alleged to have been made by C. M. Purvine after the installations were made. We shall discuss this later.

■ It has been well said that actions speak louder than words. Circumstances, clearly established, very often point the truth far more cogently than oral testimony; they do not lie. Where there is a direct dispute between two persons in their oral testimony upon a vital issue, the truth must be determined, if possible, from the proved circumstances of the case. We test the testimony of Shepard and Paula Purvine by this yardstick.

What are the circumstances which tend to support the plaintiffs in their contentions?

In the first place, they were vitally concerned with their water problems. Is it reasonable to suppose that, if they had been granted permission to use this water in the fall of 1942, as asserted by Paula, they would have waited nearly a year and one-half before doing anything about it? We are convinced that the agreement was made in 1944, because everything done by plaintiffs is reasonably consistent with that conclusion.

As above stated, on February 9, 1944, plaintiffs filed a formal application with the state engineer to appropriate water from the spring agreed upon. That application is a public record. This is some indication at least that plaintiffs labored under the idea that they would be permitted to convey the water to their premises for their domestic purposes. The allowance of their application was dependent upon this. There is nothing in the record which even suggests that plaintiffs acted surreptitiously in filing their application.

About the first of March, 1944, plaintiffs went upon the lands of defendants, cleaned the spring, and com-

menced laying their pipe line. For a period of nearly two weeks they were engaged in this construction work. Everything done in this connection was of a permanent character, including the connections made in the buildings on their premises. The work was carried on openly. Two or three men were engaged on the job. It is hard to believe that during this construction work no one of the Purvine family discovered what was being done. Plaintiffs claim that C. M. Purvine knew about it, though defendants sought to prove otherwise.

■ It was claimed by defendants that plaintiffs were permitted to use the water temporarily only because they were experiencing difficulty in securing casing for a new well which they proposed to dig, and the use was to terminate when the casing was available. We are convinced from the evidence that at that time plaintiffs did not contemplate digging a new well. They had only recently dug a well on their land to a depth of approximately 100 feet, but had made no use thereof, although it contained an ample water supply. A new well would not solve their real problem. Moreover, it appears more than passing strange that at the time plaintiffs were unable to get a reasonable amount of necessary well casing, but were able to secure promptly 2,200 feet of water pipe, with connections. Materials for private construction during the war years were scarce, but it is a matter of common knowledge that dairymen, such as plaintiffs, had a high priority for things needed in carrying on their business.

Defendant B. J. Purvine moved upon and took charge of the Purvine farm in 1945 and has since continued to live upon and manage the premises. In 1945 he knew about the installations made by plaintiffs and the use they were making of the water from the spring. Defendant W. R. Purvine also possessed that knowl-

edge in 1945. It seems significant to us that, although defendants claim plaintiffs' rights were of a temporary character only (existing only until well casing was available), nevertheless, from the time of the original installations in 1944 until at least the month of January, 1947, no one connected with the Purvine family ever inquired of the progress plaintiffs were making in securing the casing, nor did any of them make any sort of objection to the use plaintiffs were making of the water. In their testimony, defendants sought to establish the fact that C. M. Purvine was very unhappy about the arrangements he had made with plaintiffs. According to them, he felt especially chagrined by the act of plaintiffs in filing an application to appropriate the water from the spring. If we accept the testimony of W. R. (Walker) Purvine as true, his father possessed this knowledge in 1945. Is it reasonable to suppose that, if that was C. M. Purvine's true feeling, he would have remained silent insofar as talking with plaintiffs was concerned? Or would it not have been much more consistent with the ordinary course of human conduct for the elder Purvine himself, or for one of his children, to make inquiry into why plaintiffs had not dug their proposed well and, in particular, register a protest with plaintiffs concerning the filing of the application? It must be remembered that, in her version of the original agreement, Paula Purvine stressed the fact that her father had exacted a promise from plaintiffs that they would not file such an application, and that that promise was an important factor in inducing C. M. Purvine to grant the temporary license. If that was the agreement, as Paula claimed, common sense teaches us that, for its deliberate breach by plaintiffs, C. M. Purvine, or someone on his behalf, would have immediately taken the matter up with

plaintiffs upon discovery of the truth. W. R. Purvine testified:

"MR. RHOTEN: I will call Walker Purvine back for a minute. You have already been sworn, Mr. Purvine. Did your parents ever tell you what kind of arrangement, if any, they had with Ralph Shepard for the use of the water in the spring in question?

"A They did.

"Q What did they tell you?

"A Dad told me it was only a temporary set-up, that he only let him have the water there till he could get the casing and pipe to fix his own water system up, *and that Ralph had agreed not to file on the water or cause any trouble; and I came back from the Islands in 1945 and he was very much upset over the fact that Ralph had made a filing on the water and started up trouble with him.* (Italics ours.)

"Q Your father told you these things?

"A Oh yes.

"Q Where was he living then?

"A Portland.

"Q You talked to him more than once about it?

"A Oh yes. When I came back we stayed there quite a while and visited."

No serious opposition to an exercise of the rights claimed by plaintiffs was exhibited by defendants until the fall of 1949, and they never did take any definite action toward terminating the use of the water and right of way. It is noteworthy that no action of any kind was taken prior to the death of C. M. Purvine.

Everything plaintiffs did in the premises was in keeping with the idea of permanency. It is manifest that they would not have gone to the expense to which they did go, nor make such permanent installations as they did make and become, as they did, so dependent

upon this particular water for all their domestic needs, unless they had more than a temporary license, revocable at any time.

◼◼ Plaintiffs offer a satisfactory explanation for their failure to request and secure a transfer by deed of the rights granted them. They say that the gift to them was a friendly gesture on the part of C. M. Purvine, just as were the rights granted them by Barker ·and Mrs. Hiatt. These people were close friends and neighbors, and they were not dealing at arm's length. One's word was considered as good as his bond. Under the circumstances, for plaintiffs to have insisted upon a deed would have been embarrassing; in effect, it would have been expressing a doubt as to their friend's integrity. We do not believe the evidence warrants a conclusion that plaintiffs were negligent in not insisting upon a formal transfer of the rights accorded. An oral license promptly acted upon in the manner plaintiffs acted is just as valid, binding, and irrevocable as a deeded right of way.

The evidence shows that C. M. Purvine during his lifetime was an unselfish man. He wanted his neighbors to have water from his springs; provided he did not lose his own rights therein on account thereof. This is indicated by a letter he wrote to his attorneys years ago (1916). In that letter, written respecting an application he was making for the appropriation of water from the springs, he said:

"* * * We have used part of this water for irrigation, for I expect 40 years, there are people below us who depend on the flow from these springs for water for their stock & we have always allowed enough to run down for their use, not wishing to make it necessary for them to pump water for their stock which would be quite an additional task. Now I would like to know if I am required to use all of

this water, regardless of the other fellow, the two ditches will carry all of it in the summer time, & we can use all of it, but if it is left to me the men below me will get water for their stock same as they always have. * * * I don't know just what is required but I don't believe I would be required to deprive others just to fill the law."

■ As before stated, corroboration of the testimony of Paula Purvine respecting the "temporary" feature of the permit given plaintiffs is largely confined to alleged self-serving declarations made by C. M. Purvine after plaintiffs' installation had been completed. One example of such self-serving declaration is set forth in the testimony of W. R. Purvine, quoted above. We now note the testimony of some other witnesses to the same effect.

Defendant Margaret Purvine testified:

"Q  Do you know of it being installed later?

"A  Yes, I knew he was going to, and my father protested he did not want him to have it; and my mother had been discussing she was obligated to the Shepards, they had been so kind to her, and she insisted he give Mr. Shepard the right, for just a *temporary* right.  The story that came to me, though, at that time—

"Q  A story that came would not—

"A—from my parents was—

"MR. RHOTEN: Well, go ahead and tell what your parents said.

"MR. WINSLOW: I would think it is admissible.

"THE WITNESS: They said Mr. Shepard was having difficulty with his well and that some part was broken which could not be replaced until after the war, and for that reason they were letting him use water *temporarily* from the spring.

"MR. RHOTEN: Who told you that?

"A The folks. My father and mother. I understood at the time it was done that there was *nothing permanent* about the water they permitted him to take, and we never could understand why he went to the expense of putting such a pipe in.

"Q Your father and mother told you that?
"A Yes, they did." (Italics ours.)

Defendant B. J. Purvine testified:

"Q Did you see this system—this pipeline of Mr. Shepard's there when you got back from the war?
"A That's right.

"Q In the fall of 1945?
"A That's right.

"Q Did you talk to your parents about that?
"A I asked him about it.

"Q Asked whom?
"A My father.

"Q Your mother,—was she living then?
"A She died just prior to that.

"Q Yes, all right. What did your father tell you about that?
"A He told me that Mr. Shepard had come over and told him his water in his well had got so it was not good for human consumption, it was red, had some discoloration in it that soiled their laundry, and that something about his well apparatus was broken and parts did not seem available for it, and that he agreed to let Mr. Shepard have water there for his house until such a time after the war that supplies and materials were available.

"Q Did your father tell you anything else about it?
"A He said there was not any time limit on the thing, that nobody knew how long it would be, but until such a time as supplies and materials were

available he was to have the undisputed use of that water for his house.

"Q How's that?

"A That until such a time that supplies and materials were available, he was to have the use of that water for his house."

We need not conclude that C. M. Purvine did not make the statements attributed to him. These statements may have been remembered and accurately reported by the witnesses. However, at the time the alleged self-serving declarations were made, Purvine was a man well advanced in years and in poor health, suffering from heart trouble. There is little doubt that his physical condition had some effect upon his mental processes. It is not unreasonable to infer that he may have been subjected to the influence of members of his family who might have been opposed to the rights being exercised by plaintiffs. In any event, practically all the statements which it is claimed C. M. Purvine made in connection with this matter were obviously self-serving, and the testimony respecting them was in violation of the hearsay rule and, therefore, inadmissible. They were not statements made within the meaning of the res gestae rule.

Testimony respecting declarations made during his lifetime by a deceased person is admissible only in certain cases: (1) The declaration, act, or omission of a member of a family, who is deceased * * * is admissible as evidence of common reputation in cases where, on questions of pedigree, such reputation is admissible; § 2-209, OCLA; (2) the declaration, act, or omission of a deceased person, having sufficient knowledge of the subject, against his pecuniary interest, is also admissible as evidence to that extent against his successor in interest; § 2-210, OCLA; (3) The declaration or act, verbal or written, of a deceased person, in

respect to the relationship, birth, marriage, or death of any person related by blood or marriage to such deceased person; the declaration or act of a deceased person, made or done against his interest in respect to his real property; and also the declaration or act of a dying person, made or done under a sense of impending death, respecting the cause of his death; § 2-228 (4), OCLA; and (4) When a party to an action, suit, or proceeding by or against an executor or administrator appears as a witness in his own behalf, or offers evidence of statements made by deceased against the interest of deceased, statements of the deceased concerning the same subject-matter in his own favor may also be proven; § 3-103 (2), OCLA.

The testimony respecting the statements attributed to the deceased did not come within any of these exceptions to the hearsay rule.

■ However, no objection was made to the admission of this testimony. In such circumstances, it is a rule of law that such evidence has some probative value and may be considered along with the other testimony in the case. *In re Rosenberg's Estate*, — Or —, 246 P2d 858, 867; *Egli v. Hutton et al.*, 135 Or 175, 294 P 347; *Mitchell v. Southern Pacific Co.*, 105 Or 310, 209 P 718; *Wasiljeff v. Hawley Paper Co.*, 68 Or 487, 137 P 755; *Barlow v. Verrill*, 88 NH 25, 183 A 857, 104 ALR 126, and note commencing at page 1130; 20 Am Jur, Evidence, 1036, § 1185.

But hearsay testimony so admitted in evidence must be weighed with caution and in the light of its inherent weakness.

In 20 Am Jur, Evidence, 1046, § 1195, the following rule is stated:

"* * * Hearsay testimony of a witness based upon his memory of oral statements made by others

is ordinarily to be received and weighed with caution because of the infirmity of human memory. Human memory is too treacherous to place much reliance upon an attempted recital, however honest, of a conversation that has taken place between other parties, especially one that has taken place many years before concerning matters in which the witness has no special interest or one that is merely a casual or random conversation which the witness has no special reason to remember. * * * Even assuming, however, that a witness remembers conversations between, or statement[s] made by, others he may have misunderstood what was said or he may have unintentionally altered the expression actually used so as to give an effect thereto greatly at variance with what was actually said.''

It might be claimed in this case that the defendants who testified to these alleged statements had such a special interest in the matter as to have impressed upon their minds the substance of what was said. By the same token, however, that same special interest might well tempt them to alter a few words here or add a word there (such, for example, as the much used and emphasized word ''temporary''), where, as here, those few words were so important to their position.

■■ All the undisputed circumstances of this case point directly to the fact that plaintiffs' oral license was intended to be, and was and is, permanent. In reliance upon this oral license, plaintiffs made valuable improvements on and in connection with their lands and in laying the pipe line. It would be wholly inequitable and unjust to now permit defendants to destroy plaintiffs' rights. Defendants, under all the facts and circumstances of this case, ought to be, and they are, estopped to deny plaintiffs' claims. Plaintiffs' license to a use of a portion of the water from the spring in

question and to maintain their pipe line across the lands of defendants is irrevocable.

The decree of the trial court is reversed and this cause remanded with directions to enter a decree in favor of plaintiffs as prayed for in their complaint.

Neither party shall recover costs.