Argued October 29, 1956, reversed February 13, petition for rehearing denied April 17, motion to dismiss denied April 17, 1957

# HALL ET AL v. PIERCE
# HALL ET AL v. BONE

307 P. 2d 292
309 P. 2d 997
309 P. 2d 998

*Gene B. Conklin*, Pendleton, argued the cause for appellant. With him on the brief was George T. Cochran, La Grande.

*Carl G. Helm* argued the cause for respondents and cross-appellants. On the briefs were Helm & Neely, La Grande, and Brown & Van Vactor, The Dalles.

Before WARNER*, Chief Justice, and ROSSMAN, LUSK, PERRY** and McALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a decree of the circuit court, which granted to the plaintiffs a part of the relief which they sought, and a cross-appeal by the plaintiffs from the denial of the remainder. The decree established in behalf of the plaintiffs a resulting trust in a sum of money and in a farm which the complaint terms the Home Ranch. The complaint's prayer sought the establishment of a similar resulting trust in another farm known as the Sand Ridge Ranch. From the court's refusal to grant that relief the plaintiffs cross-appealed. The decree did not specify the amount of the money with which it charged the defendant, but ordered an accounting so that the amount would be ascertained.

The plaintiffs are the four daughters of the late

---

\* Chief Justice when this cause was argued.
\*\* Chief Justice when this decision was announced.

Walter M. Pierce and the executors of his will. The defendant, Cornelia Marvin Pierce, and Mr. Pierce were married December 31, 1928, after the death of the mother of the four daughters. Mr. Pierce died March 27, 1954, and his only son Loyd in March, 1942.

The four daughters, who were the plaintiffs and who have become the respondents-cross-appellants, are Lucile Pierce Hall, Helen Pierce Wilson, Edith Pierce Whitten and Lorraine Pierce Stadelman. The latter and Harold F. Hall, husband of Lucile Pierce Hall, are the executors of the deceased's will.

The defendant, Cornelia Marvin Pierce, had been State Librarian of Oregon up to the time of her marriage to Mr. Pierce. At that time Mr. Pierce was 68 years of age and Miss Marvin 55.

The subject matter of this suit is some money of an undisclosed amount and the two farms above mentioned. The complaint, referring to the farms, says: "The legal title of record to these properties presently stands in the name of defendant." Thus, it is conceded that the title to the farms is in the defendant's name. The complaint indicates that the sum of money for which the plaintiffs seek judgment was at one time represented by investment bonds and alleges that they constituted the joint savings of the parties. The plaintiffs admit that the defendant was the purchaser of the bonds and that neither their father nor they ever had possession of them. The plaintiffs surmise that the amount of the bonds was $50,000 and contend that Mr. Pierce had a half interest in the sum of money as well as in the two farms (Home Ranch and Sand Ridge Ranch). The challenged decree held that Mr. Pierce conveyed the Sand Ridge Ranch to the defendant for a valuable consideration prior to marriage and had no interest in it at the time of his death. It, how-

ever, granted to the plaintiffs all of the other relief which the prayer sought; that is, it ruled that the defendant holds a half interest in the Home Ranch in trust for the plaintiffs and that she must account to them for a half interest in the purported bond fund.

The Home Ranch was the more valuable of the two farms with which this suit is concerned. Prior to Mr. Pierce's financial difficulties, which we will later describe, it consisted of 1,800 acres or more, but in the financial depression Mr. Pierce disposed of parts of it, and at the time with which this suit is concerned it was reduced to 800 acres. The Sand Ridge farm consists of 314 acres.

November 20, 1928, a month and eleven days prior to their marriage, Mr. Pierce conveyed, by warranty deed, the Sand Ridge farm to his intended bride, Cornelia Marvin. At that time Miss Marvin was the owner of the home in Eola, Polk county, which she occupied, and possessed moneys and investments which totaled almost $30,000. The Sand Ridge farm, at the time of the conveyance, was encumbered with a mortgage in the amount of $14,656.03 principal and $2,600 interest. Taxes assessed against it in the sum of $1,141.76 were delinquent. The growing crop was subject to a mortgage in the amount of $4,742 and a crop harvest charge of $2,240 remained unpaid. In addition, Mr. Pierce owed various accounts incurred in the operation of the place, such as insurance premiums, which brought the total indebtedness attributed to that property to $34,553.88. According to the unchallenged evidence, Miss Marvin, as consideration for the conveyance to her of the Sand Ridge Ranch, assumed payment of all of those sums and paid Mr. Pierce $8,800. At that point, the deed of conveyance was delivered to her. No one contends that the consideration was unfair or

inadequate. Nor does anyone claim that she failed to pay all of the accounts and the mortgage debts mentioned in this paragraph. The conveyance of that property to the defendant was well known within the family circle. One member of the family, in referring to the conveyance, testified: "There was no gift involved; she wasn't backward about telling you the terms."

Mr. Pierce had owned the Home Ranch for many years. When he married the defendant, the property was encumbered with a mortgage held by the Equitable Life Assurance Society. The mortgage indebtedness against the place, its equipment and livestock totaled $150,000, according to the plaintiffs. In 1939 the mortgage was foreclosed and the mortgagee, upon the foreclosure sale, became the owner. It then offered the property for sale and in April, 1943, sold it to the defendant for $56,000. Of that sum $15,000 was discharged in an initial payment and the balance was represented by a mortgage. The deed of conveyance named the defendant as grantee. From April, 1943, to the day of the trial the property was constantly under lease to tenants by leases signed by the defendant as lessor.

The foregoing shows that at the time of her marriage the defendant possessed in excess of $20,000 and was the owner of her home and of the Sand Ridge Ranch. At that time Mr. Pierce was heavily in debt. The Home Ranch, as we have seen, was encumbered with a mortgage which was foreclosed in 1939 after the expiration of the moratorium imposed by federal statute. Mr. Pierce owned other ranches, livestock and farming implements but those assets also were encumbered with indebtedness and were lost through foreclosures. In addition to his mortgage debts, Mr. Pierce

owed unsecured debts which totaled $75,000 or more. The record warrants a belief that Mr. Pierce's mortgage debts and other obligations aggregated $250,000.

When adverse economic conditions rendered it impossible for Mr. Pierce to match expenses with income and he was badly in need of money, the defendant loaned him $20,000 in the hope that it would enable him to save himself from financial ruin; the complaint itself so states. The plaintiffs concede that the money was never repaid. In the succession of losses which swept away the ranches, the livestock and farming implements, the defendant managed to retain the Sand Ridge Ranch. It is now free from debt.

We have taken note of the fact that the plaintiffs claim that their father owned a half interest in the Sand Ridge Ranch notwithstanding that he had conveyed it to the defendant for a valuable consideration. They contend that he was also entitled to a half interest in the Home Ranch and in the fund of money which we have mentioned. We have noticed that title to the Home Ranch is vested in the defendant's name. It is now free from all encumbrances.

Mr. Pierce had resided in Oregon since 1881. After coming to this state he established his home in Union county. It is in that county that the ranches of which we have taken note are located. In his earlier years Mr. Pierce had been a member of the Oregon Bar and an active practitioner. Due to health factors he abandoned the practice and adopted farming and livestock raising. In the course of his life he had held many public offices such as county clerk and state senator. In 1922 he was elected governor and held that office through 1927. In 1932 he was elected congressman from the second Oregon district and held that office for the succeeding ten years. When he entered upon

his congressional duties he was 72 years of age and was 82 when he had completed them. He was 93 at the time of his death.

We have mentioned the debts with which Mr. Pierce was burdened when he was elected congressman. When he departed for Washington his purse was virtually empty and his bank accounts which had not been terminated held no balances. In order to obtain money with which to purchase the railroad tickets which would take the Pierces to Washington it was necessary for Mr. Pierce to appeal to a friend who operated a flour mill and to whom he was already heavily indebted. As stated in plaintiffs' brief, "they actually had to sell Defendant's 'last bit of wheat' in order to get to Washington." The "last bit of wheat" refers to the fact that defendant had a little wheat produced by her Sand Ridge Ranch in storage with Mr. Pierce's friend. In that manner $250 was obtained for railroad fares. Five years after his election to Congress and when he was endeavoring to persuade his friend to accept a fraction of the debt as satisfaction for the whole, he wrote: "You will probably recall that the $250 that was necessary to buy our tickets to Washington was furnished by the mill when we came here in February, 1933."

We now turn to the complaint which states the basis, or foundation, for the constructive trust which the plaintiffs prayed the court to establish in their favor. The averment reads:

"That by reason of adverse economic conditions in the summer of 1932 the funds and equities of Walter M. Pierce and defendant were substantially wiped out and lost. That in that year the said Walter M. Pierce was elected to the Congress of the United States and that thereupon he and defendant entered into an agreement whereby defend-

ant was to be appointed his secretary and she and the said Walter M. Pierce were to pool their earnings and other income and would thereafter share and own all of their properties and accumulations, including those then owned or possessed by them, excepting the property of defendant located in Eola, Polk County, Oregon, in equal parts. That as one condition of said agreement defendant was to be given full and complete charge of the earnings of both the said Walter M. Pierce and defendant as well as their joint checking account and that title to the real property acquired by them, including 'The Home Ranch' and 'The Sand Ridge Ranch', was to be put or taken in the name of defendant. It was a further condition of said agreement that expenses were to be divided equally between them and income apportioned equally to each of them. That defendant agreed to hold the properties acquired, real or personal, and properties owned by them or either of them, with the exception of the home of defendant in Eola, Polk County, Oregon, for the said Walter M. Pierce to the extent of one-half thereof. That the said Walter M. Pierce conformed to said agreement and contributed his acquisitions and earnings, placing the same in the name of defendant and by reason thereof substantial properties were taken and held, and are still held, by defendant in her individual name but for the benefit of the said Walter M. Pierce and these plaintiffs.''

The defendant, in addition to swearing that no agreement of the kind mentioned in the paragraph just quoted was made, challenges the validity of the alleged agreement. According to her, she and Mr. Pierce never entered into any agreement for a pooling of their incomes. She swore that Mr. Pierce at no time made any demand upon her for a share in any bank account or other item of property which she possessed. Her testimony indicates that she always kept her prop-

erties separate and apart from his. Before considering the challenge to the validity of the purported agreement and the evidence which shows whether or not it was effected, we will take note of some facts of a general nature which bear upon those issues.

We have mentioned the fact that at the time of the marriage Mr. Pierce owned the Home Ranch, that it was encumbered with a mortgage and that in 1939 the mortgage was foreclosed. In March, 1943, the mortgagee agreed to sell the property to the defendant for the sum of $56,000 and April 26, 1943, issued a deed which named the defendant as grantee. The deed was recorded on that day. Of the purchase price of $56,000, $15,000 was payable in this manner: $12,000 immediately and $3,000 November 1, 1943. The balance was payable in annual installments of $1,500, plus interest. Shortly prior to that time Mr. Pierce wrote a letter in which he stated that the Home Ranch had been appraised at a valuation of $60,000. The defendant swore that she alone paid the $15,000 ($12,000 in April, 1943, and $3,000 November 1, 1943). The two payments which made up the total were discharged by her own checks. Whether or not payment was made out of her own personal funds is important. Following the purchase, the price of the farm's crops advanced materially and enabled the defendant to pay the balance before maturity.

In the first two years of his term as congressman, Mr. Pierce was paid an annual salary of $7,500, together with an allowance for mileage. Two years later his salary became $10,000. The defendant was paid a monthly salary which increased in amount as time went on. In 1933 its total annual amount was $2,425.57; by 1936 it became $3,508.87 and in 1942 it was $3,891.66. She also received rental from the tenant who occupied

her home in Eola, and about 1942 received sizeable sums as bequests from two estates, together with the repayment to her from the estate of Loyd Pierce, deceased, of loans which she had made. The plaintiffs' brief gives a computation of the amounts which the Pierces received during the ten-year period in which they lived in Washington. In quoting it, we will omit its references to supporting exhibits. It follows:

> "* * * until his fifth term in Congress expired (1933-1943) Governor Pierce had a net income of $89,602.84, as shown by his income tax returns. Defendant, through the same years, had a net income of $35,149.19. In addition Defendant in 1940 received an inheritance of $33,500.00 and subsequently an inheritance of $2844.96."

The computation omits the amounts which the defendant received from (a) Loyd Pierce's estate ($2,000 or more); (2) the tenant who occupied her home; (3) the Sand Ridge Ranch; and (4) an annuity of $5,000 which she began to receive in 1942. Evidently the total income of the defendant in the ten-year period was not much below Mr. Pierce's.

The defendant testified that her husband had no money with which he could have contributed anything substantial toward the purchase of the Home Ranch from the insurance company which had foreclosed its mortgage. The purchase was made four months after the close of Mr. Pierce's term as congressman. From the close of his term and until his death he received no salary and had no income from any source, so the defendant swore. Shortly after his election in 1932 ill health compelled him to undergo major surgery and other expensive medical treatment. His income was further depleted by the expenses attendant upon his biennial campaigns for reelection. He held for a while

a high position in his political party which required him to employ, at his personal expense, stenographic help. Continuing, the defendant testified that while her husband was congressman he paid out of his salary the living expenses of the two. Although they lived economically, he complained, so his letters indicate, of the high cost of living in Washington and of the difficulty of saving anything. Upon his election to Congress, Mr. Pierce became determined to liquidate the unsecured indebtedness which he owed and devoted his savings for the next seven years to that purpose. His net income was inadequate to the task and he was compelled to ask his creditors to discount drastically the amounts which he owed them. For example, on December 31, 1937, five years after his term in Congress began, he wrote to one of his creditors:

"I have paid some on the old debts, but I still owe something like $100,000 on unsecured notes under similar circumstances to that that I owe the mill company.  *  *  *  Would you be willing to accept a nominal sum of, say, $500 for settlement of the old obligation?"

It was not until the latter part of 1939 that Mr. Pierce had discharged the last of his unsecured indebtedness. The mortgage debts were never paid—they were foreclosed.

As will be seen from the facts that we shall later mention, Mr. Pierce complained after the close of his term as congressman and at about the time when the Home Ranch was conveyed to his wife that he had been unable to save anything and that he owned nothing.

The plaintiffs make no contention that Mr. Pierce personally paid any part of the purchase price of the Home Ranch. They argue, however, that the defendant, in making payment, did so out of joint savings.

The defendant swore that she alone paid the $15,000 and that Mr. Pierce had no interest whatever in the money which she employed. She related in detail the source of the funds which made up the $15,000.

The above facts show that the purported agreement, which is averred in the part of the complaint previously quoted, is basic to the plaintiffs' case. They claim that by virtue of the alleged agreement, Mr. Pierce obtained a half interest in the Sand Ridge Ranch which he had conveyed to the defendant by warranty deed about five years previously. The plaintiffs also claim a half interest in the alleged bond fund and in the Home Ranch.

The defendant not only denies that any agreement of the kind alleged in the complaint was made, but contends that it would have been unlawful to have entered into such an agreement.

It will be observed that if the quoted paragraph of the complaint states the truth, Mr. Pierce and the defendant, after the former's election to Congress, "entered into an agreement" which bound the two to a program extending over the period in which he would serve as a congressman. It required: (1) Mr. Pierce to appoint the defendant as his secretary; (2) the two, while Mr. Pierce was congressman, to "pool their earnings and other income"; (3) the two to "share and own all of their properties and accumulations, including those then owned or possessed by them, excepting the property of defendant located in Eola, Polk County, Oregon, in equal parts"; (4) the defendant to assume "full and complete charge of the earnings" of the two; (5) "title to the real property acquired by them, including 'The Home Ranch' and 'The Sand Ridge Ranch,' was to be put or taken in the name of

defendant''; (6) expenses to be shared equally and income likewise to be apportioned equally.

If the alleged contract was made, Mr. Pierce agreed to confine himself in search for a suitable secretary to the defendant alone. In other words, he would give no consideration to any other applicant. Likewise, if the agreement was made, he virtually denied himself the right to discharge the defendant from her position as secretary in the event her services proved to be unsatisfactory. It is impossible to disregard the alleged agreement, for, as we have seen, the plaintiffs depend upon it to establish Mr. Pierce's source of money and re-acquired interest in the Sand Ridge Ranch. Unless we find that the agreement was made and that it was valid, the plaintiffs' case must fail.

Before determining whether or not the alleged agreement was made, we will consider the defendant's charge that such an agreement, if effected, would have been illegal.

■ Restatement of the Law, Contracts, § 560, says:

"A bargain by a public official, or by a candidate for public office that he will make a certain appointment is illegal; and a bargain to induce a public official to do so, is likewise illegal."

That statement is succeeded by the following Comment which elucidates the principle:

"It is the duty of a public official charged with making appointments, to make the best appointments possible and the tendency of bargains to appoint certain persons is to introduce other considerations than the public welfare."

■ From Williston on Contracts, Rev Ed, § 1730, we take the following:

"As it is the duty of a public official charged with making appointments to make the best appoint-

ments possible without reference to private interests, and as it is expedient that those occupying public office shall have such inducements as its emoluments afford for the faithful performance of their duties, a bargain to make a certain appointment or to influence the making of an appointment by such an official, or that an official will share the emoluments of his office with another is invalid.''

■ Corbin on Contracts, § 1451, states:

''What has been said about bargains for services in procuring a government contract is equally applicable with respect to other forms of administrative action. \* \* \* A bargain for the exercise of personal or political influence in procuring an appointment to a public office is illegal. This is true even though the promised payment is not contingent on success; the evil of the agreement is magnified if payment is contingent on procuring the appointment as, for example, where it is to 'split fees' received from the government.

''An agreement by a candidate for office that if elected he will appoint another as his deputy, for a consideration, is illegal as the sale of an appointment by one having the appointing power. \* \* \*''

■ Mechem's Public Offices and Officers, § 350, gives us the following statement:

'' 'It is the duty of the officer having a power of appointing,' says Learned, P. J., 'to make the best appointment in his power according to his judgment *at the time when he makes the appointment*. The public have a right to demand this. And it is against public policy that he should be deprived of the exercise of his best judgment by a contract previously made. \* \* \* Whatever may be the practice, appointments are in theory made for the public good. That is the reason why the appointee may not purchase his office. In a similar way, though not to the same extent, the public good would be injured if a promise to make an appointment

were held to be legally binding, so as to control the exercise of that judgment which the appointing officer ought to exercise when he makes an appointment. This is not a question as to the lawfulness of arrangements between the sheriff and his deputies as to their fees. The fees may be his. But the right of appointment is not the property of the appointing officer. And he has no right to barter it, or to dispose of it. It is merely a political power entrusted to him, to be exercised, not to be sold.''

The same principle is stated in the following manner by 42 Am Jur, Public Officers, § 84, p 945:

''A public office is not property, but the mere right to exercise a public function. It is not the subject of sale, purchase, or encumbrance, and cannot be acquired in any such manner; nor can the unearned salary or compensation of a public officer ordinarily be sold or assigned.

''* * * A public office should be conferred solely upon considerations of ability, integrity, fidelity, and fitness for the position, and it is the duty of a public officer having the power of appointment to make the best appointment in his power. Consequently he should not be deprived of the exercise of his best judgment by any contract previously made or obligation previously assumed.''

The principles of public law expressed in the foregoing quotations are, of course, incontestable. They have shaped congressional legislation, as we see from the statutes of which we will now take notice.

USCA, Title 2, § 86, says:

''It shall not be lawful to appoint or employ in any position under the House of Representatives more than one person at any one time, or to require or permit any such person to divide with another any portion of his salary or compensation while so employed.''

USCA, Title 18, § 1914, says:

"Whoever, being a Government official or employee, receives any salary in connection with his services as such an official or employee from any source other than the Government of the United States, except as may be contributed out of the treasury of any State, county or municipality; or

"Whoever, whether a person, association or corporation, makes any contribution to, or in any way supplements the salary of, any Government official or employee for the services performed by him for the Government of the United States—

"Shall be fined not more than $1,000 or imprisoned not more than six months, or both."

The alleged agreement to appoint the defendant as secretary was an essential covenant of the purported compact. It constituted in large part the consideration which the plaintiffs claim Mr. Pierce gave to the defendant. Then, too, the appointment when made became a principal source of the alleged investment fund. Without in any way attempting to detract from Mr. Pierce's stature, the observation must be made that the appointment to the office of secretary was virtually the only quid pro quo at his command when the alleged agreement was effected—if it was effected. Adversity, unfortunately, had stripped him of all else; he had nothing else of value that he could give. It was essential to the plaintiffs' purposes when they filed this suit to aver that Mr. Pierce gave to the defendant something of value when she, according to the plaintiffs, gave him a half interest in her estate and contemplated future income. Thus, we see that the alleged agreement to appoint the defendant to the office of secretary was indispensable to the plaintiffs' case.

■■ It must be apparent that any agreement of the kind averred in the complaint, if made, would have been

illegal. In so expressing ourselves, we have not over-looked the fact that Mr. Pierce and the defendant were husband and wife. We do not believe that a public officer, who has authority to appoint another to a salaried berth, can enter into a bargain, even with his wife, whereby he will appoint her and no other. Nor do we think that a public officer, who has power to appoint a subordinate, can lawfully agree with his appointee, even though the latter is his wife, that the two will (a) pool their properties, (b) consolidate their incomes and (c) out of the common fund make investments in which the two will share equally. The power possessed by a public officer must always be exercised for the public good exclusively. It must never become entangled with the financial ventures of the officer and his appointee in such a manner that he will be deterred from exercising his power of dismissal lest his pocketbook suffer. For the reasons just stated, we believe that if the alleged agreement was made it was illegal.

■ Having concluded that the alleged agreement upon which the plaintiffs predicated their case was illegal, but we could well terminate this opinion at this point, but we have gone on and have read carefully all of the evidence. The transcript of testimony, 520 pages long, is supplemented by several depositions. The transcript is accompanied by more than a hundred documents as exhibits. These consist of deeds, letters, leases, mortgages, ledger sheets, income tax returns, judgment rolls in mortgage foreclosure suits, and other material of like kind. We have studied all of them. Our examination of the record has convinced us that the alleged agreement was never made. We will now give a review of evidence which we have so far left unmentioned and a statement of additional reasons for disbelieving the plaintiffs' charge.

■ The plaintiffs, upon making the quoted averment by which they expected to establish the resulting trust, assumed the burden of proving it by "clear, unequivocal and convincing" evidence. *Shipe v. Hillman,* 206 Or 556, 292 P2d 123. They so concede.

The fact that the agreement, if made, would have been illegal should in itself deter the mind from believing that these two people, each of whom had held high office in this state and had displayed uncommon interest in the advocacy of high principles, would have engaged in an illegal venture. Accordingly, nothing but the pressure of cogent proof could justify us in finding that they had effected the illegal agreement.

Often a trustworthy means of determining whether or not an alleged agreement has been made, whereby it is claimed that someone, let us say X, bound himself to pursue a prescribed course of conduct over a given period, is to determine whether or not X actually followed the alleged prescribed course during the crucial time or deemed himself unrestricted by agreement. In the period to which the alleged agreement was applicable, that is, the ten years in which Mr. Pierce was congressman, he clearly felt at liberty to devote his savings to the liquidation of his old debts and gave no indication that he was obliged to contribute anything to a "pool" or other fund to be made up of his and the defendant's "earnings and other income." In the crucial period, the defendant, who naturally would have remonstrated at diversion from the pool if the alleged agreement had been made, freely acquiesced in her husband's payment of his old debts. All of Mr. Pierce's savings for seven years were required to liquidate his debts and, accordingly, for at least seven of the material ten years Mr. Pierce paid nothing into the alleged pool. By his con-

duct, he showed that he was under no duty to contribute anything into any pool, and thereby signified that no agreement of the kind upon which the plaintiffs rely was formed. The conduct of Mr. Pierce in at least seven of the ten years is clear refutation of the purported agreement. If, in the last three years of Mr. Pierce's congressional term, he placed a dollar into any pool, the evidence does not indicate the fact.

Further, it would be unreasonable to believe that an intelligent woman, such as the defendant, who (1) had a salary, (2) owned the Sand Ridge Ranch, (3) was aware of sizeable bequests which she might receive, and (4) for five years had been the unpaid creditor of Mr. Pierce to the extent of $20,000, would grant him, a debt-ridden man, a half interest in her salary, income and valuable farm for a half interest in his "earnings." That is especially true in view of the fact that she knew that Mr. Pierce was about to devote his salary to the liquidation of his indebtedness—an undertaking which was destined to consume all of his savings until September 29, 1939. His unsecured indebtedness was of imposing size and his mortgage debts amounting to $150,000 might result in the entry of deficiency judgments against him. Thus, when the agreement is said to have been formed, it was clear that the defendant was ordained to be sole contributor for many years into the alleged investment fund. Nevertheless, the plaintiffs argue that the defendant entered into an agreement whereby Mr. Pierce would be granted at once a half interest in her Sand Ridge Ranch and salary. The trial judge described the defendant as "undoubtedly one of the leading women of Oregon and a woman of the utmost intelligence and education." The unreasonableness of the alleged agreement is good reason for believing that the parties did not make it.

In order to establish the alleged agreement, the plaintiffs depend, in addition to the evidence so far reviewed, upon the following: (1) a statement contained in Mr. Pierce's will; (2) entries in the income tax reports of the Pierces; (3) statements made by Mr. Pierce to members of his family; (4) bank accounts of the Pierces; and (5) statements made by the defendant concerning the Home Ranch and the couple's savings.

The statement in Mr. Pierce's will follows:

"My present estate consists of one-half of all bonds purchased by my wife, Cornelia M. Pierce and I during our married life from our joint earnings and are now on deposit, or mostly so, in the Ladd and Bush Branch of the United States National Bank of Portland, at Salem, Oregon. Some of these bonds purchased with our jointly earned funds were issued in my said wife's name, some in my name and some in our joint names, aggregating about $50,000.00. I also own an undivided half interest in the old home farm in Union County, Oregon, containing some 800 acres and the Sand-Ridge farm near Alicel, also located in Union County, containing 320 acres, the old home farm having been paid for from moneys coming from our joint earnings, title to both farms being held in the name of my wife, Cornelia M. Pierce, pursuant to an agreement between ourselves whereby she was to so hold title thereto as trustee; also cash, notes and other personal property."

Mr. Pierce signed his will May 2, 1944, but the defendant had no knowledge of it until February 19, 1948, although the two lived together and their relationship was affectionate. Mr. Pierce at times declared that the defendant had given him a new lease on life, and upon the occasion of their tenth wedding anniversary paused

in the midst of a campaign for reelection to send her an affectionate note in which he said, ''I probably would never have seen Washington if you had not been in the picture. All honor and love to you.'' Mr. Pierce became bedfast in 1951 and died March 27, 1954.

February 19, 1948, Mr. Pierce told the defendant that he had executed a will and stated that one of his sons-in-law had possession of it. At that point he asked his son-in-law (Mr. Hall) to return the document, and upon its receipt had the defendant read it aloud to him. At the close of the reading he tore it to pieces, so the defendant swore, and threw it into the burning fireplace. The son-in-law, however, had a photostatic copy of it made before it was sent to Mr. Pierce. It is from that photostatic copy that we copied the above paragraph. It is clear that the will was destroyed.

The plaintiffs depend in part upon the above-quoted paragraph of the will to prove the alleged agreement and their contention that Mr. Pierce owned a half interest in the two ranches and the alleged bond fund. We shall now mention other evidence upon which they depend. According to the testimony of one of Mr. Pierce's daughters (Mrs. Stadelman), her father and the defendant were visitors in the witness' home September 17, 1943, five months after the life insurance company had conveyed the Home Ranch to the defendant. At that time, according to the witness, her father said that the Home Ranch belonged to ''both of us.'' Another of Mr. Pierce's daughters (Mrs. Hall) swore that in the evening preceding the execution of the will her father told her that the defendant ''was determined not to keep her promises and that he wanted to draw up his will'' and that he declared, ''I know that if I went to court I would get my half.''

She swore that, in referring to the defendant, he said, "she was boss," "she was a good manager," that he spoke of "our" farm and "our" crops, and added:

> "I never heard him say it was hers or his only. It was joint. 'We' this or 'we' had a good crop, or 'we' did that. * * * 'We saved my salary but we lived on Cornelia's salary. * * * We lived economically and frugally in Washington. We were saving our money'; and they were trying to buy back that Home Place—that Home Farm; and they didn't even entertain in Washington like many of them did; * * *."

Mr. Harold F. Hall, husband of the witness to whom we just referred, testified that just before the Pierces left for Washington for Mr. Pierce's first session in Congress, Mrs. Pierce complained, in her husband's presence, that "the operations of the farm had used up all of their money." Upon their return home he heard one of them say that they had lived economically in Washington, had used only Mrs. Pierce's salary and had endeavored to save Mr. Pierce's. Upon that occasion Mr. Pierce, according to the witness, "commended Mrs. Pierce for doing a splendid job of managing his finances." The witness testified that about six months after the Home Ranch was conveyed by the insurance company to the defendant, Mr. and Mrs. Pierce inquired of him whether it would be advisable to sell "our" property, divide their profits and invest the proceeds in Government bonds. The defendant, in making her inquiry, according to Mr. Hall, said:

> "It is my opinion that we should sell our Booth place and divide our profits and make our separate investments of it."

By "Booth place" she meant the Home Ranch. Mr. Hall said that he answered in the negative and that thereupon Mr. Pierce spoke up:

"That is exactly the same notion that I have, and I have been trying to get Cornelia to see the investment from the same angle."

Mr. Hall added:

"She referred to their respective half * * * she said, 'Do you think it advisable for us to sell and to divide our profits or to invest them in Government bonds?' "

About that time Mr. Pierce, according to the witness, protested:

"Well, I'll never sell my half of the farms and invest them in bonds."

Mr. Hall related the circumstances that preceded the preparation and signing of the will. He helped with those details and took Mr. Pierce first to the attorney who placed the will in final form and then to the attesting witnesses. According to him, Mr. Pierce explained:

"I earned over $100,000 while I was in Congress. * * * I want my children to have what I earned and my agreement with Cornelia was that we would pool our funds and divide our earnings, and I have earned a great number of times more money than Cornelia has, and for the first time she is now showing signs that she would not carry out her promise to equally divide our funds. * * * Cornelia is honest and in most respects she carries out any promise that she will make. * * *

"When we first went to Congress and when we were both broke, we had lost our equities in our farms, and we were now trying to get back. The opportunity was afforded to us; she agreed to work,

to pool her money and to divide it. She agreed not only to divide it but to manage the thing. She has managed. I have not written over a half dozen checks since that time; all of them are from her. She has had our joint banking account; she had our joint fund in there; she is a good manager; she is a good woman, but she has now shown signs for the first time of not keeping her promise."

The above does not include every detail of the oral and testamentary declarations made by Mr. Pierce in which he indicated that the alleged agreement was made and that he owned a half interest in the property described in the complaint, but it suffices to show the nature of his utterances which the witnesses attributed to him.

A letter which the defendant wrote to Mrs. Stadelman about six months after the defendant had received from the insurance company the deed to the Home Ranch, contained the following statement to which the plaintiffs attach importance:

"When the place was bought I paid $6438 plus and have had expenses since. Of the money paid by your Father—$5560—there was $4347 which I put in the bank for him to pay his income taxes and have a little balance to call his own for checking account. He owned $2000 of that as he had lent it to Loyd and it had been repaid to me with my loan."

■ The statement contained in Mr. Pierce's will and the utterances which he made to members of his family were self-serving. Before the trial commenced, the testimony of some witnesses who related admissions against interest made by Mr. Pierce were taken by deposition. The self-serving declarations presented by the plaintiffs were, therefore, properly received in evidence. ORS 41.850; *Pratt v. State Industrial Accident Commission*, 201 Or 658, 271 P2d 659; *Shepard v. Pur-*

*vine*, 196 Or 348, 248 P2d 352. They were properly received even though they were presented as a part of plaintiffs' case in chief. *Beard v. Beard*, 66 Or 526, 133 P 103.

In order to refute the evidence just reviewed, the defendant offered the testimony of several witnesses which indicated that after Mr. Pierce's term as congressman had come to a close he had no assets. One of those witnesses, a dealer in investment securities, testified that Mr. Pierce told him in 1948, "I have nothing. See Mrs. Pierce—she has the money." Another witness, who testified that she had known Mr. Pierce "ever since I was a little girl," testified that in the fall of 1944 Mr. Pierce said:

> "I am a man who has had two lives. At 67 years of age, I was ruined politically and broke financially, and then I married Cornelia. Since that time I have got on my feet financially and have had a second political career."

The postmaster of Salem swore that in 1946 or 1947 Mr. Pierce told him:

> "I have nothing, everything belongs to Cornelia."

Continuing, he added:

> "* * * other times I heard him relate in the old way—I think almost everybody who knew the Governor has heard him say, 'I don't own an acre of land or a cow critter.' I heard him say that many times."

Another witness stated that March 8, 1944, Mr. Pierce declared in an address which he delivered before a meeting of the Farmers Union that serving the public had been costly and that "he didn't have an acre of land, a critter nor even a trailerhouse." The witness

added that in 1948 Mr. Pierce told him that his political career "had caused him to lose everything that he had, and he was dependent entirely upon Cornelia for a home, medicine and care." Elmer Case, who lived near the Home Ranch, testified that in 1944 he inquired of Mr. Pierce whether he could obtain a lease upon the Sand Ridge land and that Mr. Pierce told him "that didn't belong to him, to see Cornelia." The witness identified several leases to the Sand Ridge Ranch which the defendant, as lessor, and he, the witness, as lessee, had signed in the succeeding years.

In addition to presenting the evidence which we just epitomized, the defendant offered many papers which the plaintiffs concede were taken from the letter files of Mr. Pierce. They appear to be carbon copies of letters which Mr. Pierce wrote to friends, relatives and others. None of the addressees were parties to this suit. Although some of them reside in Oregon, others live in Florida, Texas and California. No request had been made of the addressees to produce the originals. The defendant contends that all of the statements in the letters upon which she depends were against Mr. Pierce's interests. To illustrate, we quote the following from four of them:

"I own no land now. It is all gone."

"Financially, I have been a great failure."

"I haven't any financial means, not cash enough to pay the income tax that will be assessed against me for 1942 income."

"I have saved nothing out of my salary since I have been here. It went into election expenses and to pay debts, expenses of living, income tax, etc. My wife has saved a little."

The trial judge sustained the plaintiffs' objections to the carbon copies and excluded them. We will later

state the objections. We must bear in mind that since two of the plaintiffs are the executors of the decedent's estate, the statements which were excluded and the letter files which contained them were those of the adverse party.

The defendant, referring to Mr. Pierce, testified, "I was his secretary." That fact was conceded by the paragraph of the complaint which we have quoted. She also testified, "I was the only secretary" and added that she alone had charge of Mr. Pierce's files. Papers taken from the files were recognized by her on account of notations upon them. She explained, "I put everything in the file that had to do with his business." When she was presented the papers with which we are concerned and was asked whether they "came from those files" she answered, "Surely they did, I put them there." She had no acquaintance with some of the addressees, but, as to all of them, swore that they were individuals with whom her husband had correspondence. She asserted, "Every letter that ever went out from our office had a carbon copy kept on file." In some cases the defendant was able to swear that her husband had signed the original, and in others she recognized the continuity of the correspondence by saying "It fits into a chain." In still another situation, she commented:

> "Knowing that business well and having read both letters, I believe that that was the letter. This is a carbon copy of a letter signed by Walter M. Pierce."

There was attached to an occasional carbon copy the letter which the addressee had written to Mr. Pierce. Many of the letters recounted facts, details and circumstances of a nature so intimate to Mr. Pierce that

scarcely anyone except himself could have composed the letter.

The record does not disclose the identity of the stenographers who typed the letters, nor did anyone testify that he saw Mr. Pierce dictate or type them. The stenographic work displayed by the letters varies, thereby indicating that the stenographic help changed from time to time.

When the carbon copies were offered as evidence, the plaintiffs interposed an objection based upon ORS 41.640, which says:

"There shall be no evidence of the contents of a writing, other than the writing itself, except:

"(a) When the original is in the possession of the party against whom * * *; * * *."

In making their objections, the plaintiffs contended that the defendant had not brought herself within any of the exceptions enumerated in the statute's provisions. The defendant argued that for Mr. Pierce's purposes the carbon copies were originals. In view of those facts we alluded to the exceptions with brevity. In some instances the plaintiffs added to their objections "incompetent, irrelevant and immaterial"; in others they claimed that the paper had not been properly identified. In making their objections, their counsel pointed out:

"We will not object with respect to those exhibits on the ground that there is no proof that they were taken from Governor Pierce's files."

The record contains no intimation that anyone tampered with the files. Evidently, when the defendant testified, the files were not in her immediate possession, for she gave her testimony by way of a deposition

while she was confined in a hospital. A physician was in attendance throughout. In answering some of the questions, she protested that since she was away from the files she was handicapped.

The accuracy of the letter files was recognized when an occasional carbon copy taken from them was received in evidence without objection. In those instances, the evidence which showed that the files had been maintained with accuracy evidently persuaded counsel and the trial judge that Mr. Pierce's retention of the carbon copy showed that he deemed it a correct memorandum of words which he had written.

It will be noticed that the purposes served in this case by the carbon copies did not consist of their competency—if they possessed any—to prove that the addressees received the letters. Whether or not the letters reached the addressees was immaterial to the defendant's purposes. The defendant was not concerned with the addressees' knowledge of the contents of the letters, and was not seeking to charge them with any liability. The potency of the letters, so far as the defendant was concerned, was to establish that Mr. Pierce, by preserving the carbon copies, manifested that he regarded them as accurate memoranda of letters which he had written. We shall illustrate what we have in mind by resort to one of the carbon copies. Its addressee was Miss Jennie A. McConnell of Sacramento, California, who was a mortgagee of Mr. Pierce. The carbon copy dwelled upon the deplorable economic conditions and then said:

"Will there be value in the land upon which you have a mortgage? That depends upon the price of cattle, wool and sheep. At present prices there is no value * * *."

The part of the letter which the defendant deems material reads:

> "We simply have no money, neither Loyd nor I, and I have bled my wife white. She had $20,000 when she came to live with me and it is all gone, trying to save these ranches."

Obviously, Mr. Pierce deposited that carbon copy in his files so that by returning to it he could ascertain what he had written to Miss McConnell. The purpose of files is to enable their possessors to know by consulting them the exact words which they wrote to a given person upon a past occasion. Thus they are memoranda, although they have the appearance of copies of letters. For the filekeeper's purposes the "original" is not the letter in the addressee's possession. The addressee may have tampered with it; but whether or not he did, the carbon copy in the file is the paper upon which the filekeeper depends. He knows that it is accurate and it supplies him with the information he wishes when he writes other letters. The carbon copy was not produced for him as a communication. McCormick on Evidence, § 206. It was produced solely as a memorandum. For him, the carbons are the "originals" of his memoranda or files. It is immaterial whether the writer signs the carbon copy, mails it and places the original in his files; the same result follows. *Lockwood v. L. & L. Freight Lines, Inc.*, 126 Fla 474, 171 So 236.

If the letters which Mr. Pierce had written to his correspondents in Texas, California and elsewhere had been produced, his signature upon them would have assured the trial judge that he had actually made the statements recited in the carbon copies. But the proof supplied by the signature would have been cumulative. The evidence, which showed that the files were accu-

rately maintained by a competent secretary and that carbon copies of all letters which Mr. Pierce wrote were deposited in them, vouched for the fact that the carbon copies which the defendant offered constituted Mr. Pierce's utterances.

The question now occurs: Were the carbon copies which the defendant presented admissible in evidence? We see from the foregoing that the carbon copies belonged to Mr. Pierce, were kept in his office and were maintained for him by his secretary in the regular performance of her duties.

The text of Wigmore on Evidence, 3d Ed, § 1073, includes an excerpt from Horne Tooke's Trial, 25 How St Tr 1. The trial occurred in 1794 and was based upon a charge of treason. The incident to which the excerpt quoted by Wigmore refers happened when the prosecution offered a paper addressed to the accused which was found in his house. We quote:

"* * * Mr. Tooke: 'I do not know what papers may have been taken from my house; but are letters written to me to be produced as evidence against me?' L. C. J. Eyre: 'Being found in your possession, they undoubtedly are producible as evidence; but, as to the effect of them, very much will depend upon the circumstances of the contents of those letters, and whether answers to them can be traced, or whether anything has been done upon them. A great number of papers may be found in a man's possession which will be, "prima facie", evidence against him, but will be open to a variety of explanations; and it is always a very considerable explanation that nothing appears to have been done in consequence of the paper being sent to him. But all papers found in the possession of a man are, "prima facie", evidence against him, if the contents of them have application to the subject under consideration.' "

*United States v. Greene, et al.,* 146 F 784, was based upon an indictment which charged conspiracy to defraud the government. The issue before the court was the admissibility of a letter press copy of a letter purporting to have been written by Lieut. O. M. Carter to Gen. Duane. The court ruled:

"* * * It is, moreover, objected that this letter should be excluded because it is not the original; that no notice was served on Gen. Duane to produce the original; that in its nature it is secondary evidence; and that no effort has been made to lay a foundation for the introduction of secondary evidence. Ordinarily, an objection of that sort must be sustained, but the object of all evidence is the ascertainment of truth, and courts are not restricted to Procrustean rules, if the varying character of the events involved require a modification of such rule. The inquiry being as to the state of mind of Carter, the question is not whether he sent this letter, but whether he wrote it as the expression of his mental condition at the time it was written. That he did write it is shown, not only by the handwriting, by the subject-matter, but by his possession of it. Conceding this to be true, in the absence of proof to the contrary, we have the right to presume that at the time he wrote the letter he intended to send it. It was written for transmission through the mail to a person who had a control in the matter to which his wishes related. Until the presumption above stated is rebutted, the court will presume that he intended to send it. But whether this is true or not, has the government the right to use it as a deliberately recorded expression of his wishes, as indicating his state of mind. The letter was found in his possession; it was in his handwriting; it involved matters of duty with which it has already been made clear that he was charged. How, then, can it be questioned that this typewritten paper, found in Carter's letterbook, kept by himself personally locked up in his oaken file

case, was Carter's act? Is not that the truth? Who can doubt it? It would also seem to be in the nature of a written admission of his purposes. Said Mr. Greenleaf on this subject (13th Ed.) vol. 1, § 198:

" 'The possession of documents, also, or the having of constant access to them, sometimes affords ground for affecting parties with an implied admission of the statements contained in them.'

"This doctrine is also followed in the recent and comprehensive work, Wigmore on Evidence, vol. 1, par. 260. * * *''

From *Holbrook v. Jackson,* 7 Cush 136, which was argued by brilliant counsel and decided by Chief Justice Shaw, we take the following excerpts:

"* * * Among the facts to be proved, were the actual insolvency of the mortgagors, or the reverse; whether they had or had not reasonable grounds to believe themselves solvent; and whether the mortgagee had or had not reasonable grounds to believe them insolvent. * * * To prove the state of the firm as to solvency, their knowledge and belief respecting it, and the reasonable grounds which they had or had not to believe themselves solvent, the books of the firm were competent evidence; and the proof that they were kept as books of account are usually kept by mercantile houses, and were recognized and acted upon by them as exhibiting a true and correct state of their affairs, was sufficient proof of authentication for that purpose. * * * * *

"* * * We thought it was right; for though Wood said he did not keep the books, yet the books were their regular books, kept under their direction; they annually took a trial balance, and kept an account of profit and loss. Every merchant must be presumed to know, and in fact, from his balance sheet and books generally, does know, the state of his concerns. This was the objection, and this was the decision upon it.''

Section 260, Wigmore on Evidence, 3d Ed, includes the following taken from *Wright v. Tatham,* 7 A. and E. 313:

"Knowledge of letters and of other things found in a place accessible to him in his own house or apartments, may sometimes be presumed; such as writings connected with the charge, upon a charge of treason; notes or other documents forged or partly forged, upon a charge of forgery; instruments of coining or house-breaking, upon charges of coining or burglary."

In stating the effect of the rule which is represented by the quotations which we took from §§ 260 and 1073 of Wigmore on Evidence, 3d Ed, Section 260 states:

"* * * it may be used to evidence *assent* to the document's contents or an *admission* of their truth (*post,* §§ 1073, 1074), or, as an *admission* adopted by the party as his own though composed by some one else (*post,* § 1079, *e. g.* the publications of which the defendant is a member), * * *."

From *State v. Ford,* 76 Kan 424, 91 P 1066, we quote:

"The fact that bills found in Ford's presence upon the premises, and apparently relating to the business there carried on, were made out in his name, certainly had some tendency to establish, not perhaps that any specific items therein named had actually been sold to him, but that he was the proprietor of the place."

*People v. Ramsey,* 83 Cal App 2d 707, 189 P2d 802— a prosecution for abortion—held that no error was committed when the trial judge received in evidence a loose-leaf notebook found in the defendant's cupboard beside a telephone and containing the hour of appointment with full name, address and telephone number of the prosecuting witness. The defendant pointed out that the state had failed to prove how long the book

had reposed in the cupboard, who placed it there and who made the entries, yet the book was held admissible.

*Cameron v. Cameron,* 232 NC 686, 61 SE2d 913, was a suit for divorce instituted by the wife, in which the husband, in addition to denying the complaint's accusations, set up a cross-action on charges of adultery. In order to establish his charges, he presented letters written to his wife by men acquaintances which were found in her private desk. Upon appeal, she argued that the letters were not admissible for the reason that they had not been identified and that it was not shown by whom they were written. In ruling in favor of admissibility, the court said:

"* * * The retention of letters, apparently addressed to the plaintiff, in her private desk, together with her reference to them in her complaint, would give rise to the inference of her knowledge of their contents and acquiescence and assent thereto."

McCormick on Evidence, § 191, p 403, states:

"Should not the practice of accepting as prima facie genuine a document which comes from a natural custody be extended beyond the field of public duty, and be recognized for writings found in private custody? It seems that it should, but that here the practice should be discretionary, and that if the judge finds that the purport of the writing and the fact that it was found in a place and custody natural for such a paper, and the other attending circumstances, make its genuineness substantially probable, it should come in. The strictness of some of the decisions at this point seems misguided when we remember that these facts are offered only as a prima facie showing of genuineness, freely open to counter-proof."

■ We shall review the authorities no further. They hold, according to our interpretation of them, that

when there is found in the home, the office or on the person of an individual writings which pertain to matters of material interest to him, and when the circumstances are such that it is reasonable to infer that he was familiar with the document, the latter, as illustrated above, is admissible in evidence if material to the issues. The effect of the writing is not conclusive—other evidence is admissible. The rule governs admissibility, not weight.

In the case at bar, the letter file was maintained for ten years in Mr. Pierce's office while he was congressman. It was kept for him by his wife as his paid secretary. In the succeeding years the file was kept in the Pierce home.

We believe that the rules of law of which we have taken notice authorize a conclusion that the carbon copies, described in preceding paragraphs, were admissible in evidence for the purpose of showing prima facie that Mr. Pierce knew of them, was familiar with their contents, and that he was the author of the letters represented by them.

We conclude that the aforementioned carbon copies were admissible in evidence and that they must be given consideration in the disposition of this case. Their status was that of memoranda maintained for the convenience of Mr. Pierce. They were not copies for the purposes of this case; they were the originals of his files.

We shall now take note of the contents of some of the carbon copies. It must be recalled that the plaintiffs claim that (1) the purported agreement set forth in the complaint was formed; (2) the Pierces were committed to the creation and maintenance of a joint investment fund; (3) Mr. Pierce became a half owner in the Sand Ridge Ranch when the alleged agreement

is said to have been formed; (4) Mr. Pierce became a half owner of the Home Ranch when the defendant received a deed of conveyance to it in April, 1943. In attempting to prove those contentions, the plaintiffs presented the testimony of which we have already taken notice. In many instances, it consisted of oral declarations which the witnesses attributed to Mr. Pierce. The statements—if Mr. Pierce made them—were self-serving. The testimony concerning them was given after Mr. Pierce's death, and in many instances many years after he is said to have made the statements.

The purported utterances of Mr. Pierce upon which the plaintiffs depend were oral and may have been recalled by the witnesses inaccurately or possibly were not heard correctly, but the carbon copies represented statements made by him in writing and at the time when the incident about which he wrote was fresh in his mind.

We shall make only brief reference to the carbon copies in the file which recorded the expressions which Mr. Pierce made shortly after his election to Congress. In them he complained with bitterness that value had departed from his farms and that the future was unpromising. He declared that, not only was his fortune gone, but "Cornelia's money as well." We have quoted from his letter to Miss McConnell in which he lamented that the defendant had been "bled white" in efforts to save the farms. A few months later he wrote to a friend:

> "They have taken all my property. I don't even own the old mill, not a pig or a cow nor a piece of machinery."

The plaintiffs, as we have seen, contend that the two Pierces had agreed to pool their salaries in a

joint investment fund, and presented evidence indicating that the two were living upon the defendant's salary while they were saving Mr. Pierce's. Accordingly, it becomes material to take note of what Mr. Pierce was writing upon those subjects during his residence in Washington. November 11, 1936, he wrote:

> "First, it is mighty expensive living in Washington, far from being all profit. I have paid the entire expenses of myself and family from my income, and paid many personal bills. My wife I have allowed to save her salary to which she surely has a right, as she put all of her cash into this farm to endeavor to save foreclosure."

December 31, 1937, he wrote to a friend to whom he was indebted:

> "My wife has saved her salary since we have been in Washington."

August 31, 1938, he wrote to one of his mortgage creditors:

> "With my salary as Congressman, I pay the entire expense of the office. My present wife is not on your note. * * * My present wife is my secretary and has her salary and has kept it and it is hers."

July 10, 1941, he wrote to a friend in La Grande:

> "As you know, my savings have amounted to practically nothing, for during the first six years here in Washington everything was turned over to my creditors that I had left over, and it takes practically all of my income today to meet the expenses that naturally accrue. It is surprising how large they are."

December 17, 1943, he wrote to a member of his family in La Grande:

> "All the savings that were made here by myself went to pay the debts that accumulated when farm-

ing did not pay under my management and that of Loyd. I haven't any financial means, not cash enough to pay the income tax that will be assessed against me for 1942 income."

It will be recalled that in March, 1943, the defendant agreed with the Equitable Life Assurance Society to purchase the Home Ranch and that the initial installment of the purchase money ($12,000) was paid in April, 1943. The plaintiffs claim that at least one half of the purchase price was discharged with money belonging to Mr. Pierce. It, therefore, becomes material to see what, if anything, Mr. Pierce was saying about that time concerning his finances. November 9, 1942, he wrote to one of his brothers who resided in Florida:

"Everything is gone. I own no land, no personal property."

December 31, 1942, he asked the local telephone company to discontinue telephone service for the Home Ranch. He explained:

"Since the farm is now sold to another and I shall never return to the farmhouse, I have no reason for remaining as one of the subscribers."

April 1, 1943, he wrote to a friend in Rockport, Texas, "I own no land now. It is all gone." In the letter he complained that he had "been a great failure" financially but believed he had "done some things for the State and the people." April 16, 1943, he wrote to a friend in Washington, D. C., about matters of mutual political interest, and then said:

"In about a week I am going up to the old wheat ranch."

By that term he referred to the Home Ranch. He added:

"Cornelia has purchased it so I can feel at home for a short time at least."

December 17, 1943, he wrote the disconsolate letter from which we have already quoted in which he stated "I haven't any financial means" and explained that he did not have enough to enable him to pay his 1942 income tax.

In April, 1943, the deed to the Home Ranch was delivered to the defendant. It, therefore, becomes important to determine whether or not, at any subsequent time, Mr. Pierce wrote anything indicating that he had an interest in that property. June 2, 1943, he wrote to friends in Fredericksburg, Virginia, stating:

"I persuaded my Grandson who is farming the home place to summerfallow about 500 of the 800 acres. This leaves a little less than 300 acres this year in crop. This will give Cornelia the product of 200 acres on the two farms she rents or about $7000 in money. * * * Cornelia has two offers of $4000 advance on the purchase of the home property."

September 25, 1944, Mr. Pierce wrote to an old-time friend in Portland in which he commented upon a recent visit that he had made to Eastern Oregon, and then said:

"Dr. Temple offered a hundred dollars an acre which was very tempting to Cornelia. This meant a profit to her of about $25,000 with about half that amount in income tax and a cash balance and no place to put it."

January 2, 1944, Mr. Pierce again wrote to his friends in Virginia:

"The only thing that prevented financial collapse in this household was that I persuaded Cornelia to hold the land. I don't know of anything half as good and as safe for the desperate days ahead as the land that you own in Virginia and Cornelia owns in Oregon."

October 17, 1945, Mr. Pierce wrote to a friend in Shell Beach, California, in which he commented upon the farms and their crops. The comment said in part:

"Returns from the farm were pretty good this year. However, she applied most of it on paying the mortgage off. Her 320 acres that lie near Alicel, Cornelia was offered $40,000.00 cash for that farm this Fall."

It will be recalled that Mr. Pierce signed his will May 2, 1944. We quoted the paragraph of it which the plaintiffs argue supports their suit. One of the letters from which we just quoted was written about four months after the will was signed, another bears date four months before the will was executed, and the third a year and a half after the will was signed. Each of those letters contains statements adverse to the self-serving declarations that are enunciated in the will. We have found no letter or carbon copy which indicates that Mr. Pierce asserted that he owned any interest in the Sand Ridge Ranch after he sold it to the defendant, or in the Home Ranch after the insurance company conveyed it to her in April of 1943.

The above review of the carbon copies is, of course, incomplete. Occasional statements contained in them of which we have made no mention lamented the loss of Mr. Pierce's fortune. Expressions of that kind are, of course, adverse to the contentions of the plaintiffs that Mr. Pierce was entitled to a half interest in investment bonds worth in excess of $50,000. It will be observed that the statements and observations which formed parts of his letters were to the same effect as those which he enunciated in the conversations with friends represented by the depositions reviewed in preceding paragraphs.

The foregoing, then, are statements which the decedent made in writing over a period of many years. Beginning with 1943 and continuing on into 1948 his declarations constantly spoke of his financial ruin. In a letter or two he even traced the roots of his misfortune to an ill-starred venture in which he became involved in California when he was a young man. His letters repeatedly mentioned how his vast land holdings were lost to him when the product of the soil dropped to unprecedented lows and his mortgagees foreclosed. Space does not permit us to recount the many trips which he made to the New York offices of the mortgagees and the earnest pleas which he sent to them in vain efforts to stave off foreclosure. Nor have we so far alluded to the fact that in the end the Equitable Life Assurance Society took the position that it would not deal with him any more and even refused to consider him as a prospective purchaser of the place. The correspondence makes it clear that by 1943, when the defendant received the deed of conveyance, Mr. Pierce, who at one time prided himself upon his vast domain, had lost interest in land ownership. In fact, in October of 1941 he wrote to an old friend, whom he greeted in the salutation as "My dear old Chum," in the following vein, "I don't own an acre of land nor a cow nor a horse. I have forgotten all about them now." His interest had been transferred to other subjects.

The foregoing shows that if Mr. Pierce's files can be trusted, he acknowledged that the defendant was the owner of the Sand Ridge Ranch and that when the deed to the Home Ranch was delivered to her he was wholly without funds. No letters, carbon copies or other writings (except the will) were presented by the plaintiffs bearing any expressions contrary to

those which we quoted. There is no contention that anyone tampered with the files or carbon copies.

It is claimed, however, that when Mr. Pierce made the above expressions he was heavily in debt and that he was negotiating at those times with his creditors for releases upon the payment of less than the full amount of the debt. Obliquely, it is suggested that he was endeavoring to withhold from his creditors knowledge that he actually possessed substantial assets. The intimation just mentioned tends to cast an unfavorable reflection upon Mr. Pierce, a citizen of this state whose memory many hold in high esteem. It will be recalled, however, that by September of 1939 Mr. Pierce had settled with his last creditor and that by that time the mortgagees had won their foreclosure decrees. Accordingly, after 1939 Mr. Pierce no longer had any motive to mislead anyone concerning his assets, if he ever entertained any unworthy purpose of that nature. Reverting to the excerpts from the carbon copies which are set forth in preceding paragraphs, we notice that most of them were written by Mr. Pierce after 1939 and that many of them were made to individuals who were friends and not creditors. We reject this contention which seeks to discount the value of Mr. Pierce's utterances as reflected in the carbon copies.

■ The plaintiffs, in an endeavor to prove that Mr. Pierce acquired a half interest in the Home Ranch when the Equitable Life Assurance Society delivered the deed to the defendant in April, 1943, stress the fact that the defendant's letter to Mrs. Stadelman (previously quoted) stated:

"Of the money paid by your Father—$5560— there was $4347 which I put in the bank for him

to pay his income taxes and have a little balance to call his own."

The defendant gave a detailed explanation of the manner in which she assembled the sum of $12,000 which constituted the initial payment of the purchase price of the Home Ranch. In giving her explanation, she cited her bank accounts and the other sources from which she got together the needed sum of money. She even traced the money which constituted the balances in the bank accounts. Her explanation, although carefully scrutinized by the plaintiffs, has not been challenged. She admitted that she employed as part of the purchase money $1,213.25 which belonged to Mr. Pierce, but declared that she felt justified in using that money because he acknowledged that he was indebted to her in a much larger amount. She said, in part:

"* * * it was really a gift to me but it wasn't a real contribution. I will take the latter because he really owed me more than that."

We think there is nothing novel about her statement concerning the aforementioned sum of $4,347, for we observe that at times she rendered money available to her husband so that his needs could be met without his making a request of her. The income tax return for 1952 shows that in that year she spent $6,559.58 upon his care for nurses, medicine, ambulances, hospital and similar facilities. We do not believe that Mr. Pierce was a purchaser of the Home Ranch or that he paid any part of that property's purchase price.

The plaintiffs call attention to the fact that after the Home Ranch was conveyed to the defendant in April, 1943, the income tax returns filed by the Pierces credited Mr. Pierce with half the income and expenses of the property. Attached to the return of each of the

two was a paper which read in part: "I own two farms in Union County, Ore. which stand in my name—320 acres and 800 acres * * *." The returns were made before federal legislation authorized a division of the kind which was employed. The plaintiffs contend that, since the income was equally divided, the defendant thereby admitted that Mr. Pierce was the owner of a half interest in the ranches. The evidence indicates that Mr. Pierce prepared the returns until 1948 when infirmity forced him to discontinue. The defendant, however, wrote the slip attached to the returns from which we quoted. She swore that internal revenue agents and employees of the state income tax department told her that division of income was authorized. Extensive cross-examination did not shake her faith in her explanation, but brought forth from her the name of the federal agent who gave the purported advice, and a statement that the returns were examined by the local income tax office before they were filed. We observe that the division of income and expense was made, not only concerning the Home Ranch, but also of the Sand Ridge Ranch. It is clear that the defendant never entertained any thought of acknowledging that Mr. Pierce had any interest in the Sand Ridge property. As to the latter at least, the division was clearly made to effect a reduction of the income tax and not for the purpose of acknowledging divided ownership. The excerpts taken from the carbon copies show that in the period covered by the income tax returns, Mr. Pierce was declaring that he owned no land and did not possess even "a critter." Whether or not the federal agent whom the defendant named gave the purported advice, we believe that the defendant split the income of the two ranches solely for the purpose of gaining an income tax advantage,

and not for the purpose of showing that her husband possessed an interest in the properties. We do not think that her act in attributing a half interest of the income to Mr. Pierce was an admission of ownership in his favor.

■ The plaintiffs have failed to discharge the burden of proof which they undertook when they filed this suit. It is our duty to try the cause anew. ORS 17.440 and 19.070. The result is a decree for the defendant.

Reversed.

ON REHEARING

On Respondents' Petition for Rehearing

Helm & Neely, La Grande, and Brown & Van Vactor, The Dalles, for the petition.

George T. Cochran, La Grande, and Gene B. Conklin, Pendleton, contra.

ROSSMAN, J.

The petition for a rehearing argues that the pooling agreement averred in the complaint, and which received analysis in our previous opinion, does not constitute the sole basis for recovery which the plaintiffs submitted. They argue that an alternative theory of recovery is contained in their complaint and that it can be found in the paragraph of that pleading which we quoted in our opinion. According to them, that paragraph submits as an additional basis for recovery the theory of a resulting trust; and they further contend that the purported resulting trust has its source in money contributed by Mr. Pierce toward the purchase price of the Home Ranch. A brief submitted by the plaintiffs in support of their petition for a rehearing endeavors to show that all, or at least much, of the initial payment upon the Home Ranch was defrayed with money belonging to Mr. Pierce. Although we are satisfied that our original opinion correctly states the

source of the money which discharged the first installment of the purchase price of the Home Ranch, we are not averse to assuming for a moment that some of Mr. Pierce's money was used for that purpose.

In advancing its contention, the petition for a rehearing argues:

"This Court has adopted the rule that a contributor to the purchase price is entitled to an interest in the property in the proportion that his contributions bear towards the purchase price, as opposed to the aliquot part rule."

It will be recalled that when the deed was prepared and delivered it named Mrs. Pierce alone as grantee. Likewise, all leases were signed by her alone as lessor.

■ Mr. Justice Robert S. Bean, on behalf of the court, said in *Hayes v. Horton*, 46 Or 597, 81 P 386:

"* * * It is a general rule of law that where the purchase price of land is paid by one person, and the title taken in the name of another, the grantee will hold it in trust for the person furnishing the money, even without a declaration to that effect: 2 Story, Eq. (13 ed.), § 1201. But this rule does not apply to a purchase by a husband in the name of his wife, or by a parent in the name of a child. In such case the presumption is that the purchase money was intended as an advancement or gift, until the contrary is established by the evidence: 2 Story, Eq. (13 ed.), § 1203; *Welton v. Divine*, 20 Barb. 9; *Guthrie v. Gardner*, 19 Wend. 414. If, therefore, it be assumed, although not clearly shown by the evidence, that the purchase of the property and the improvements thereon were made with the defendant's money, there can be no resulting trust in his favor on account thereof, because there is no evidence to overcome the presumption that it was intended as a gift to her. * * *"

In accord with the decision just reviewed, see *Coe v. Coe*, 75 Or 145, 145 P 674, in which it is said:

"\* \* \* No agreement was entered into by Dr. Coe and Mrs. Coe when the real property was purchased and the deed secured whereby she stipulated to hold the legal title in trust for him or for any purpose. This being so, an error was committed in the part of the decree disposing of the home."

Our two decisions of which we have just taken note represent the general rule. Scott on Trusts, 2d Ed, § 442, and 89 CJS, Trusts, § 127.

■ In our original opinion we reviewed the evidence which shows that if any of Mr. Pierce's money constituted a part of the initial payment upon the purchase price of the Home Ranch, the record affords no basis for any belief except that he intended it as a gift to his wife. It will be recalled that at that time Mr. Pierce was heavily indebted to his wife, and that he had many times expressed himself as most grateful to her. We are aware of no evidence which indicates that if he contributed anything to the first payment, he did not intend it as a gift to her.

The above does not mention all of the propositions and arguments presented in the comprehensive brief which accompanies the petition for a rehearing, but all have been carefully considered.

The petition for a rehearing is denied.

Perry, C. J., and McAllister, J., dissent.

On Respondents' Motion to Dismiss Appeal

Helm & Neely, La Grande, and Brown & Van Vactor, The Dalles, for the motion.

George T. Cochran, La Grande, and Gene B. Conklin, Pendleton, contra.

ROSSMAN, J.

This cause is again before us, this time upon a motion to dismiss the appeal. Our opinion was rendered February 13, 1957. Thirty days later the respondents-cross-appellants filed this motion to dismiss. It gives the following as the grounds upon which it is based:

"Plaintiffs represent to the Court that the decree from which appeal was taken herein (Appel-

lant's Abstract 31), a copy of which is hereto affixed, marked Exhibit 'A' and by this reference made a part hereof, is and was an interlocutory decree and was not appealable, and that no account or accounting has been taken as provided for therein and no further orders or decrees entered."

Our decision described fully the challenged decree and mentioned the fact that it ordered the defendant to account; it said:

"The decree did not specify the amount of the money with which it charged the defendant, but ordered an accounting so that the amount would be ascertained."

■ The decree which was challenged by the appeal was entered by the circuit court August 21, 1956; notice of appeal was filed September 7, 1956; and notice of cross-appeal October 11, 1956. Thereupon the appeal was perfected, the transcript was filed, the briefs were delivered to this court and then the oral arguments were made. Our decision, as we said, was rendered February 13, 1957. Not until thirty days later was the motion to dismiss filed. Evidently the motion challenges the entire appeal, both the one resulting from the appellants' notice of appeal and also the one coming from the respondents-cross-appellants' notice.

ORS 19.010 says:

"For the purpose of being reviewed on appeal the following shall be deemed a judgment or decree:
* * *

(a) An order affecting a substantial right, and which in effect determines the action or suit so as to prevent a judgment or decree therein.
* * *

(c) A final order affecting a substantial right, and made in a proceeding after judgment or decree."

The contention submitted by the motion to dismiss is that the decree was not final within the terms of the legislation just quoted. Should jurisdiction actually be lacking, the appeal should be dismissed even though an opinion has already been handed down on the merits. *Shely v. Votaw (Ky)*, 272 SW2d 462; *MacNeill v. Maddox*, 194 Ga 802, 22 SE2d 653. Such a motion was denied, however, in *Alamo Motor Lines v. International Brotherhood* (Tex Civ App), 229 SW2d 112, the court saying:

> "As a general rule a cause appealed to this court will not be dismissed after a decision has been rendered and an opinion handed down."

■ In their efforts to sustain the motion to dismiss, the respondents-cross-appellants depend much upon *McEwen v. McEwen*, 203 Or 460, 280 P2d 402. The opening paragraph of that opinion described in the words which we will now quote the nature of the proceedings which culminated in the entry of the interlocutory decree:

> "This is a proceeding for a declaratory judgment to determine the existence and extent of an alleged partnership, for a dissolution of the partnership and an accounting, and for other equitable relief, brought by * * *."

No motion was made by the respondent to dismiss the appeal, as is indicated by the decision itself in saying: "No motion was filed in this court to dismiss this appeal." It is true that the ownership of a 320-acre tract of land of undisclosed value and whereabouts was involved in the proceeding, but concerning it the decision said:

> "* * * The decree is considered as a whole, and the incidental relief respecting the 320-acre

tract of land does not make the decree a final decree from which an appeal may be taken.''

That was, therefore, an instance in which relief concerning the tract of land was incidental. The accounting was the chief objective.

*Lyon v. Mazeris*, 170 Or 222, 132 P2d 982, which received no mention in the McEwen decision, was written by Chief Justice BAILEY, who bestowed upon the problem now before us his usual meticulous care in matters pertaining to legislation. The decision stated the nature of the controversy in these words:

"The plaintiff, John L. Lyon, instituted this suit against Gene Mazeris, Underbit Sheep Corporation, Emigrant Creek Land Company, a corporation, and others as defendants, for the purpose of having the plaintiff declared owner of certain personal property, consisting of sheep, other livestock and camp equipment, described in the complaint, and two tracts of land in Harney county comprising 1,680 acres, and for an accounting by the defendants.

\* \* \*

"The main object of the instant suit was to have the plaintiff declared the owner of the real and personal property in litigation. The decree appealed from was a final determination as to such ownership. And upon the court's adjudging that the plaintiff was the owner an accounting by the defendants followed as an incident to that determination. Inasmuch as the rights of the parties in the property were adjudicated, nothing further remained to be done by the court to carry the decree into effect so far as concerned the ownership and possession of the real and personal property.''

The decision, after showing that the statute governing appeals had its genesis in the civil code of 1862, cited the amendments which were subsequently made by the

legislature in order "to enlarge the right of appeal." After he had cited the decisions which were announced prior to the enactment of the liberalizing amendments, and all of which had been adverse to efforts to appeal from decrees containing anything in the nature of interlocutory provisions, Mr. Justice BAILEY declared:

"In making the amendments of 1907 and 1915 the legislature undoubtedly took cognizance of the above decisions of this court and intended to enlarge the right of appeal. It did not attempt to prevent an appeal in those instances in which the court had held that the right of appeal existed, as, for example, in circumstances such as shown in *Marquam v. Ross,* supra.

"The decree appealed from in the case at bar, although denominated interlocutory, was in effect final and not interlocutory, because determinative of the principal issue involved. The substance of the order, and not the name given it, establishes its nature. In accord with the reasoning and ruling in *Marquam v. Ross,* supra, it is our opinion that the principal issue between the litigants herein was determined by the order under consideration, and that such order was therefore final, consequently appealable.

"Were this not the case, the defendants would be deprived of the title and possession of the real and personal property involved, long before the entry of the decree on the accounting, and would be denied the right to have the *res* remain in *statu quo* until a final determination of the controversy could be had in this court. An appeal after the entry of a decree on the accounting might be unavailing because not effectual to stay the enforcement of that part of the decree affecting the ownership and possession of the property. The decree appealed from in the instant case, as that in *Marquam v. Ross,* supra, was susceptible of immediate enforcement, whereas in *Froman v. Jones,* supra, *Winters v. Grimes,* supra, and *Muellhaupt v. Strow-*

*bridge Estate Co.,* supra, the decree attempted to be appealed from lacked finality.''

We deem it unnecessary to review again our previous holdings. They take the position that if the decree fixes the rights and liabilities of the parties upon the subject of the controversy and refers the matter for accounting purposes only, the decree is deemed final for the purposes of appeal. *McEwen v. McEwen,* supra, was not intended to make any change in the trend of authority.

The decree challenged by this appeal settled fully all of the equities between the parties, and had it been affirmed nothing would have remained to be done except to conduct the accounting.

The motion to dismiss the appeal is denied.